CEDARS CORPORATION, A NEBRASKA CORPORATION, APPELLANT, v. H. KRASNE & SON, INC., A NEBRASKA CORPORATION, ET AL., APPELLEES.

CONSOLIDATED WITH:

CEDARS CORPORATION, A NEBRASKA CORPORATION, APPELLANT, v. JACOB J. FRIEDMAN ET AL., APPELLEES.

202 N. W. 2d 205

Filed November 17, 1972. Nos. 38328, 38329.

Martin A. Cannon of Matthews, Kelley, Cannon & Carpenter, for appellant.

John S. Katelman and Frederick S. Cassman of Abrahams, Kaslow & Cassman, Louis A. Seminara of Seminara, Meazell & Turco, Steven J. Lustgarten, and Ernest B. Wintroub of Wall & Wintroub, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

SPENCER, J.

This is an appeal from the refusal of the trial court to order an accounting from other participants in a joint venture. We affirm.

Cedars Corporation, owned and controlled by Edward E. Milder, initially filed its petition against Jacob J. and Willard J. Friedman and the Valley Ho Corporation, seeking an accounting of their management of Sun Valley Development Company, the joint venture. A demurrer was sustained for the failure to include necessary parties. Plaintiff thereupon filed an amended petition naming the Valley Ho Corporation and all the other corporations as defendants. Cedars Corporation also filed an action for an accounting against H. Krasne & Son, Inc., and joined as defendants Concord Corporation, U. S. Investment Company, and Thamco Corporation, Inc., all Nebraska corporations, all of whom are parties in the first action. The actions were thereafter consolidated for trial.

For several years previous to 1959, Jacob J. Friedman and his son Willard had been engaged in the home construction business. The Friedmans, who had successfully developed some smaller tracts, became interested in a 100-acre tract of land in Sarpy County which was listed for sale for the price of $125,000. While the Friedmans desired to acquire the property for the purpose of developing the land into building sites and thereafter to construct houses thereon, they decided it was

not feasible for them to tie up substantial working capital in the cost of the land and development expense. Willard contacted Edward E. Milder, the Friedman's accountant; Howard Kaplan, an insurance man; Maurice Udes, president of a lumber company; and Millard Krasne, his father-in-law, a department store executive, and suggested the formation of a joint venture for the purpose of acquiring and developing the land. The parties were receptive to Willard's suggestion, and the Sun Valley Development Company was formed. To limit their liability the various investors contracted through individual corporations. The Friedmans contracted through Thamco Corporation; Milder through Cedars Corporation; Kaplan through Concord Corporation; Udes through U. S. Investment Company; and Krasne through Mid-States Investment Company. Each of the corporations invested $15,000 in the joint venture except Concord, Kaplan's corporation, which invested $25,000, making a net investment of $85,000.

The agreement of the parties is contained in two documents, the articles of joint venture and a management agreement. The material provisions of the articles of joint venture are the following:

"2. The joint venture shall comprehend all activities and transactions necessary, suitable or calculated to effect the acquisition, development and profitable sale of that one hunded (100) acre tract of land situated in Sarpy County, * * *.

"Without in any way limiting the generality of the foregoing, it is contemplated that the joint venture will undertake and seek to accomplish the completion of the purchase of the above described property, the replatting thereof into suitable blocks, lots and streets, necessary zoning changes, surfacing of streets, installation of water, power, gas and other utility lines, provisions for sewage and drainage, preparation of building sites, including engineering studies, surveys, grading and contouring, the formulation of building pro-

grams (including house designs and plans), and financing, selling and promotion. * * * . .

"6. The joint venture shall cause the books and accounts thereof to be accurately kept and each and every transaction relating to the business of the venture shall appear therein and the venture's books, records, papers and documents shall always be open to the inspection of each of the adventurers or its legal representatives, with the right to make copies thereof. Periodically the books shall be balanced and audited by an independent certified public accountant, copies of whose reports with respect thereto shall be furnished to each adventurer. Upon the completion of the business of the venture, a final audit shall be similarly made and supplied, and distribution of the net avails, gains and capital less losses, shall be made in accordance therewith."

The material provisions of the management agreement provide:

"4. Friedmans shall, with the prior approval and authorization of Company, cause engineering studies and surveys to be made for the proper subdivision of said real estate into streets, blocks and lots, shall obtain therefor appropriate zoning, plats, street designations, utilities and sewer facilities, and shall undertake and cause to be done such other things as may be necessary and suitable to secure approval therefor from the proper civil authorities.

"5. Friedmans shall, with the prior approval of Company, cause house designs, plans and specifications to be prepared and submitted for Company approval and, when authorized, shall contract for the construction of buildings according to such approved plans and specifications and shall manage, coordinate and supervise all construction activities so as to assure the efficient and economical erection of the specified buildings conforming to proper construction, zoning and financing standards. Friedmans shall negotiate for and arrange required interim, construction and purchase financing

and shall see to the carrying of such insurance coverages as Company shall authorize and direct, and shall draw upon Company for funds to pay costs and expenses during construction within such time as to afford to Company cash discounts and concessions for prompt payment.

"6. Friedmans shall, after consultation with and approval of Company, determine prices for each lot and/or groups of lots as well as house and lot combinations and do all things and perform all acts necessary, suitable and advisable to promote the expeditious and economical development and sale of the entire tract with the view to obtaining the maximum profit and benefit for Company. Friedmans shall be empowered without further authority to accept any purchase offers for any lot, group of lots or house and lot which meet or exceed the price fixed and approved therefor. Except where Company authorizes a larger commission, the sales commissions to a realtor, real estate broker or agent other than Friedmans, shall be two and a half $(2\frac{1}{2}\%)$ percent of the gross sales price."

The Friedmans purchased the land and placed the title in Mid-States Investment Company, Krasne's corporation. The Friedmans hired an engineer and took the necessary steps to prepare the land for the development, including the formation of a sanitary improvement district. The funds of the Sun Valley Development Company were used primarily in payment of the expenses arising from the preparation of the land. When its funds ran short, rather than contacting the investors for more money, the Friedmans through one of their corporations purchased several of the lots in order to increase the capital. Willard Friedman, who was called as a witness for the plaintiff, testified that he told Milder that the Friedmans would be the primary purchasers of the lots although they did intend to sell some to other builders and individuals. Willard also testified that he and his father determined generally the price to be charged for the lots. Yearly and sometimes semi-

annual reports were made to the members of the joint venture over a 7-year period before the question involved in this litigation arose. During this period Milder was the accountant and bookkeeper for the Sun Valley Development Company and for the Friedmans individually, as well as for their corporations. In addition to the question as to plaintiff's right to accounting from the parties herein, the basic issue is whether, under the terms of the joint venture the Friedmans and their corporations are required to account to the joint venture for the profits accruing from the construction of houses on the lots purchased by the Friedman corporations.

This action, being equitable in nature, comes under the provisions of section 25-1925, R. R. S. 1943, and is here for review de novo.

Before considering the question of the right to an accounting, we consider whether the construction of houses was embraced within the ambit of the joint venture. Plaintiff essentially relies on the following language in Article 2: "* * * it is contemplated that the joint venture will undertake * * * the formulation of building programs (including house designs and plans), and financing, selling and promotion." From this the plaintiff argues that the agreement unambiguously defines the scope of the joint venture as including construction, and therefore contends that parol evidence is not admissible to vary its clear terms. There are indeed portions of the joint venture agreement which would indicate that the construction of houses could be within its scope. However, there was a condition precedent which is controlling.

The words quoted above are specifically limited in Article 5 of the management agreement by the words: "Friedmans shall, with the prior approval of Company, cause house designs, plans and specifications to be prepared and submitted for Company approval and, *when authorized*, shall contract for the construction of buildings according to such approved plans and specifica-

tions * * *." (Emphasis supplied.) The plaintiff has offered no evidence that such authorization was given, and in fact, except for plaintiff's testimony as to his understanding, the evidence, as suggested later, is otherwise. Rather than contracting for the construction of houses, the Friedmans purchased the lots and handled the construction through their own corporation. Interpreting the agreements without reference to parol, the plaintiff failed to sustain its burden of proof on this issue.

In Ely Constr. Co. v. S & S Corp. (1969), 184 Neb. 59, 165 N. W. 2d 562, we held: "In interpreting a written contract, the meaning of which is in doubt and dispute, evidence of prior or contemporaneous negotiations or understandings is admissible to discover the meaning which each party had reason to know would be given to the words by the other party. * * * Parol evidence is generally admissible when it is offered for the purpose of explaining and showing the true nature of the transaction between the parties."

It is to be noted that there was no provision for the adventurers to add more capital and absolutely no provision for them to share in the losses that might accrue. In fact, the corporate form of the agreement would indicate a specific intent to limit the liability to the amount actually invested. Only the Friedmans obligated themselves for the house construction costs. This was done individually or in the name of their corporation. There is no way in which the joint venture could have been liable for the house construction costs.

We conclude that there was a sufficient ambiguity as to exactly what fell within the scope of the joint venture for the trial court to admit parol evidence to explain the agreement of the parties. The testimony is undisputed that the articles were drawn "in a broad form so that the joint venture could start to do one thing and if it ever had to change its direction, it could do so."

The articles of joint venture and the management agreement were both signed on the same day, December 1, 1959. They were signed for the purpose of establishing and setting in motion the operations of the joint venture, and should be construed together as one instrument. The general rule is that, in the absence of anything to indicate a contrary intention, instruments executed at the same time by the same parties for the same purpose and in the course of the same transaction are, in the eye of the law, one instrument and will be read and construed together as if they were as much one in form as they are in substance. Employers Mutual Casualty Co. v. Brazda (1950), 152 Neb. 633, 42 N. W. 2d 195.

Approximately 6 months after the management agreement was signed, the Friedmans assigned it to Valley Ho Corporation, which was owned and operated by them. The management agreement contained a provision against assignment without written permission. No written permission was obtained. The evidence is conclusive, however, that Milder participated in the assignment; the parties were aware of it; and no objection was raised to it until more than 7 years later. We find the parties acquiesced in it and are now estopped to question the absence of written permission.

Participants other than the plaintiff testified that they were not interested in any construction after the development of the lots. Maurice Udes' testimony on this point is a follows: "A. Of course when he brought it to me in the first place it was discussed as a development company. The purpose of which was to develop lots. Subsequently when I saw the agreement the terminology suggested that there might be some construction or construction could be permitted by the joint venture. And at that time I raised the point. I was not interested in making an investment in a construction company and I would not make an investment in a construction company because it would conflict with

my primary business which is supplying other builders. I told him that I would not be interested in any construction if it were contemplated. Q. Did he make a reply to that? A. Yes. MR. CANNON: Same objection — continuing objection that is. THE COURT: Overruled. A. Yes, he explained that this terminology was simply written into the agreement to give the joint venture a broad enough definition or latitude and that no construction was contemplated and if any construction were to be done it would have to be done with the consent of those involved in the joint venture. Q. Then what was your understanding as to the basic activities contemplated by the joint venture? A. The activities of the Sun Valley Development Company were solely to develop lots and to supply lots primarily for Willard Construction Company and any other builders that might be interested. Willard Construction Company needed lots to build on. So it was a sort of a back to back deal so to speak. We had what I considered to be an assured customer for these lots. Q. Now who are you referring to? A. Willard Construction. I felt he was a locked in customer because Willard was going to look to us for a source of supply for lots. In my opinion on this basis it was a wonderful investment opportunity for us. We had a guaranteed assured customer."

Howard Kaplan testified as follows: "Q. Will you relate what discussion, if any, took place about the business activities contemplated by the joint venture? A. It was my understanding that it was to be a land development project. Q. Will you explain what your understanding was with reference to what is meant by 'land development'? A. Well, it was that this was bare land that was to be developed and sub-divided into lots and that we were to share in the profits from the sale of lots. Q. Was there any information forthcoming as to who might be the purchaser of lots or who might construct houses on the lots? A. We knew

that the Friedmans would purchase lots and houses would be built on the lots by the Friedmans and that there would be lots also available for sale to any other builders who might be interested."

Millard Krasne testified: "Q. Will you continue, Mr. Krasne, and relate your discussion that you had with the Friedmans or anyone else with regard to this development? A. Mr. Friedman came up with the idea of expanding and getting some people into the development company. I made it very clear to him at that time that I was not interested in doing more than just developing the land into lots. I had just acquired some additional parts of the People's store and I did not have any extra capital to go in on any venture other than just the development of the lots which we knew how much money it would take. I indicated to them that was how much I was willing to put in to it. Q. I understand that you were not personally interested in any other type of venture other than land development, is that correct? A. That is correct. Q. Was there any discussion with reference to who might purchase these lots from the joint venture? A. It was understood all along that these lots would be offered to anybody to build on them including Willard."

For more than 7 years Edward E. Milder, the sole owner of Cedars Corporation, the plaintiff, as the accountant for the Friedmans and their corporations, as well as the Sun Valley Development Company, prepared income tax returns for the Friedmans and had them pay the income tax on the house profits. He also prepared income tax returns for the joint venture and made the accountant statement expressing his opinion that all money and accounts were handled by proper accounting procedures. His explanation as to the consistency of his conduct with his present contention is not too convincing.

The question remaining is whether the plaintiff has a right to an accounting from the Friedmans, Valley Ho

Corporation, or H. Krasne & Son, Inc. This is premised on plaintiff's contention that the Friedmans profited, or Krasne permitted them to profit, at the expense of the joint venture. There is no way on the present state of the record to sustain this procedure.

The articles of joint venture provide that: "Periodically the books shall be balanced and audited by an independent certified public accountant, copies of whose reports with respect thereto shall be furnished to each adventurer. Upon the completion of the business of the venture, a final audit shall be similarly made and supplied, and distribution of the net avails, gains and capital less losses, shall be made in accordance therewith."

It is to be noted that the agreement specifically provides that the books are to be periodically audited by an independent certified public accountant. From the formation of the joint venture until May 31, 1967, Edward E. Milder served as the bookkeeper and accountant for it. While he was not a CPA he was a public accountant and as such was operating an accounting firm. He prepared annual and semiannual financial reports on the joint venture and furnished them to the other participants. The following letter, under the signature of Edward E. Milder, as accountant and auditor, under date of June 19, 1967, is the form of cover letter used in each instance for the reports:

"To the Partners

"Sun Valley Development Co.

"We have examined the books and records of the Sun Valley Development Company, a Nebraska Joint Venture, as of May 31, 1967, and have prepared therefrom the accompanying balance sheet as of May 31, 1967, and the related statement of operations and partner's capital analysis for the period then ended. Our examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records, and such other

auditing procedures as we considered necessary in the circumstances.

"In our opinion, the accompanying balance sheet and statement of operations and statement of partner's capital present fairly the financial position of the Sun Valley Development Company at May 31, 1967, and the results of its operations for the period then ended in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year.

"Respectfully submitted,
"EDWARD E. MILDER /s/
"Edward E. Milder
"Accountant & Auditor."

We can only conclude that by their actions the plaintiff and the other partners accepted this as compliance with the agreement. Since 1967, the reports have been furnished to the adventurers by a certified public accountant.

While all of the joint adventurers, the Friedmans individually and their corporations, are parties herein, the Sun Valley Development Company, the joint venture, is not a party. The business of the joint venture has not yet been completed. The Sun Valley Development Company is still in existence. The testimony indicates that there are several lots to be sold at well as a commercial area to be developed. The agreement provides that upon the completion of the business of the joint venture a final audit shall be made and supplied. Consequently no final accounting is yet due.

The agreement does provide for periodic audits of the joint venture by an independent certified public accountant. While we conclude that the plaintiff by its conduct has waived the provision for a periodic audit in the past, or rather, Milder by his conduct has interpreted the provision to mean the type of report submitted by him, the agreement is specific as to the type of audit to be conducted: "Periodically the books shall

be balanced and audited by an independent certified public accountant, * * *. Upon the completion of the business of the venture, a final audit shall be similarly made and supplied, and distribution of the net avails, gains and capital less losses, shall be made in accordance therewith."

It is an audit of the joint venture which is covered by the agreement. The joint venture is not a party to this action. However, this is an equitable action and all of the joint adventurers are before the court. To avoid further litigation the books of the joint venture should be balanced and audited by a certified public accountant for the period of the joint venture to date, and a copy of this report furnished to each of the participants in the venture. This audit is to be only of the joint venture. It does not include the construction and sale of houses which we have determined are no part of the joint venture. It should include all other items incident to the development and sale of the land.

For the reasons given, we affirm the judgment of dismissal in both cases. This is without prejudice to the right of any of the joint adventurers to file an action for an audit of the books of the joint venture by a certified public accountant unless such audit is furnished to the adventurers within 90 days after the issuance of the mandate herein. Costs are taxed to the plaintiff.

AFFIRMED.

SMITH, J., not participating.