PATRICK W. ANTRIM, APPELLANT, V. CLYDE PITTMAN,
APPELLEE.
203 N. W. 2d 510

Filed January 12, 1973. No. 38519.

Respeliers & DiMari, for appellant.

Otto G. Spielhagen of Spielhagen, Matejka & Spielhagen and Arthur S. Raznick, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

SMITH, J.

Clyde Pittman, a buyer of corporate shares, claimed breach of an ancillary covenant by the seller not to compete. Part of the covenant restrained the seller, Patrick Antrim, from engaging in a "similar business as conducted by the corporation. . . ." A jury returned a verdict for Pittman, and the district court overruled the motion of Antrim for judgment notwithstanding the

verdict. Antrim appeals. He asserts that the interpretation of the covenant in the district court was erroneous and that it imposed on him a restraint unreasonable in character.

Antrim, owner of two-thirds of the issued and outstanding shares of AAA Heating & Air Conditioning, Inc., actively participated in the business. His acquaintance with the customers was wide. On June 3, 1970, he sold all his shares to Pittman, the only other stockholder, Antrim then making the negative covenant.

The corporate books, but no sales slips or invoices, were transferred to Pittman. According to Antrim, AAA was then engaged in the heating and air conditioning business but not in the plumbing or any other business.

Within the time frame of the covenant Antrim successively managed two companies that retailed water softeners but not heating or air conditioning equipment. The second company was owned by his wife.

Pittman testified that the business of AAA on June 3, 1970, encompassed sales of water softeners. We weigh that statement with other testimony by Pittman, relevant parts forming an appendix to this opinion. The evidence of such sales was weakened by derivative inferences. The corporate books must have contained names of suppliers, and he could have easily ascertained whether AAA had received water softeners. Pittman's lack of knowledge was singular. His testimony to AAA's water softener business prior to sale of the shares is unbelievable. Conjecture is not proof. Barkalow Bros. Co. v. Floor-Brite, Inc., 188 Neb. 568, 198 N. W. 2d 329 (1972). See, also, Dow, "Judicial Determination of Credibility in Jury Tried Actions," 38 Neb. L. Rev. 835 at 848 (1959). No other evidence on the point is noteworthy.

Pittman adduced evidence that the business of selling water softeners was similar within the language of the

negative covenant. Assuming that meaning, we review the applicable law.

Officers or shareholders upon selling their individual shares may make reasonable restrictive agreements not to compete with the corporation. Farmers State Bank v. Petersburg State Bank, 108 Neb. 54, 187 N. W. 117 (1922); 14 Williston on Contracts, § 1641, p. 134 (Jaeger, 3d Ed., 1972). Rules similar to those that govern sales of going businesses and employment contracts apply. Calamari and Perillo, Contracts, § 356, p. 540, n. 3 (1970).

Behind the requirement of reasonableness of a covenant in restraint of trade at common law lies a public policy that balances certain social interests. They are the social detriment in the restriction upon the promisor, the social advantage in protection of legitimate interests of the promisee under the contract, and the desirability of good will that is vendible. The permissible degree of restraint is the restraint necessary to prevent interference with the good will. See, Wittenberg v. Molly-neaux, 60 Neb. 583, 83 N. W. 842 (1900); Carpenter, "Validity of Contracts Not to Compete," 76 U. Pa. L. Rev. 244 at 254, 255 (1928). In a sale of corporate shares the test is whether the seller's opening a business of his own would substantially affect the corporate good will. The test was endorsed by Professor Corbin. See 6A Corbin on Contracts, § 1388, p. 60 (1962). In the sale of a business the restraining promise is illegal as to lines of trade other than those sold by the party whom the covenant restrains. There is a possible exception if the lines are so intermingled that one cannot be protected without inclusion of the other. 6A Corbin, op. cit., § 1387, p. 57.

Invalidity of the promise at common law does not depend upon proof of actual harm. "The belief that such promises are harmful has been so generally and firmly held for some centuries that their enforcement has been refused by the courts, . . . (unless) accompanying factors counterbalance the harm. That the

promise is only a part of a larger transaction of purchase and sale is such a factor; but it is not one that will invariably save the validity of the promise," 6A Corbin, op. cit., § 1384, p. 44.

Inclusion of the water softener business in the negative covenant of Antrim would have been unreasonable. No intermingling line of trade, no accompanying factor, counter-balanced the harm in enforcement. Such a covenant to the extent that it covered the water softener business would have been unenforceable.

For the foregoing reasons the judgment for Pittman on his claim under the negative covenant was erroneous. The judgment is reversed and the cause remanded with directions to render judgment notwithstanding the verdict.

REVERSED AND REMANDED WITH DIRECTIONS.

APPENDIX

TESTIMONY OF CLYDE PITTMAN

"Q . . . What type of a business was . . . (AAA) in? A It did heating and air conditioning and plumbing work. Q At the time of the purchase of your stock, was this also a plumbing operation? A Well, the company had a plumber. I didn't get involved in that part of it . . . I understand . . . (the plumber) was employed with me after we bought this stock as a plumber. We had another plumber for a while also. Q Were these plumbers there prior to your purchase of the stock? A They had been there before. At the exact date of the sale of the agreement of the corporation, I'm not sure. Q Were they employed as plumbers? A Well, I'm not sure. . . . I don't know what he carried them on the books as. I didn't get involved in that. Q Did they perform any plumbing operations? A Not that I ever saw. I mean, I didn't work in that part of it. . . . Q . . . Do you know of any specific instances that AAA was in the plumbing operation at the time of the sale of stock? A No, I can't give you a specific job, or — Q To your knowledge

did it perform any plumbing operations? A Well, we — Q Without going into any specific jobs? A No, the company is a heating, air conditioning and plumbing company as we bought the corporation. . . . Q Now, prior to your purchase of the stock, did AAA . . . sell water softeners? A Yes, sir. . . .

"Q You indicated that you never observed any plumbing work being done by AAA prior to the time that you bought the last of the stock? A . . . I didn't go on service trucks or that sort of thing. I didn't see anybody doing plumbing. . . .

"Q . . . (H)ow many units of water softeners had AAA sold prior to June 1 of 1970? A I don't really know. Q Do you know of any? A I know of one in my own house, for instance. . . . Q But how many customers for profit? . . . A I don't know. . . .Q And you were working full time in this business from . . . 1969 . . . until . . . you bought the business? A I was working for six months in the business, yes. Q During that time of your own personal knowledge, did you know of water softeners being sold by AAA? A I can't give you the names of any, no. Q . . . (A)t this time you did not have a master plumber on your payroll? A That's right. . . . Q Isn't it true that the plumbing aspect of the AAA . . . started when you took over the business and . . . Antrim left? A Well, we made a lot of changes, but I wouldn't say it started there. I bought a mechanical contracting business and they handled a lot of things. . . . Q . . . (Y)ou testified . . . (to no) personal knowledge that AAA . . . sold water softeners; is that correct? A I don't know of specific accounts or people they sold it to, no. Q That is not to say that the air conditioners or soft water conditioners weren't sold by AAA . . . without your knowledge; is that correct? A That's correct."