STANDARD MEAT COMPANY, A NEBRASKA CORPORATION,
APPELLEE, V. LLOYD FEERHUSEN AND
LARRY FEERHUSEN, APPELLANTS.

282 N. W. 2d 34

Filed August 14, 1979.   No. 42227.

Rollin R. Bailey of Bailey, Polsky, Huff, Cada & Todd and Ted L. Schafer, for appellants.

Ginsburg, Rosenberg, Ginsburg & Krivosha, for appellee.

Heard before BOSLAUGH, McCOWN, and CLINTON, JJ., and BURKE and WHITEHEAD, District Judges.

CLINTON, J.

Plaintiff, Standard Meat Company, a corporation, brought this action in equity to enjoin the defendants, Lloyd Feerhusen and Larry Feerhusen, father and son respectively, from conducting the business of selling meats and other food products to the "food service industry" in competition with the plaintiff and from using a certain improved piece of real estate in the city of Lincoln, formerly owned by Lloyd Feerhusen (hereinafter Feerhusen) and sold by him

to Larry, for that purpose. It was alleged the conduct threatened by the defendants was in violation of the provisions of a certain contract previously entered into between the plaintiff and Feerhusen, of which provisions Larry had both actual and constructive notice. The trial court granted the injunctive relief prayed for. Both defendants appeal to this court. The issue on appeal, as it was in the trial court, is the proper construction of the contract. We affirm.

The precise question in this case is whether a provision in the contract, prohibiting for a period of 15 years the use and occupancy of the building on the real estate in question for the purpose of supplying the "food service industry" in competition with Standard, applies in the event of sale of the premises by Feerhusen.

It is necessary to recite some of the undisputed background facts and to summarize or quote provisions of the contract pertinent to the issue. The contract was entered into on November 2, 1968. At that time Feerhusen was doing business in the building in question under the trade name of "Del Gould Meats" and was engaged in selling meats and other food products to the "food service industry," hereafter FSI. The contract defined FSI as including: ". . . all eating-away-from-home establishments, such as hotels, restaurants, clubs, institutions, both private and governmental, schools, . . . [certain other specifically described businesses or entities] and all other 'away from home' feeding establishments." Feerhusen desired to sell that portion of his business to Standard, while continuing to conduct a business known in meat purveyor's parlance as "fabrication," "breaking," and "jobbing." Standard desired to acquire certain assets belonging to Feerhusen pertaining to FSI and to acquire and serve Feerhusen's customers.

At the time the contract was entered into, Standard

was expanding its facilities in Lincoln to accommodate the increased business anticipated from acquiring Feerhusen's FSI customers. The contract closing was to occur immediately following completion of Standard's facilities, but not later than January 1, 1970. All of the above is shown by evidence or recitals in the contract.

The contract provided that Standard would purchase the assets of Feerhusen previously mentioned and pay for them the sum of $30,000. The contract contained promises by Feerhusen as follows: "(b) He will not engage, directly or indirectly, by ownership or investment, as an individual, member of a partnership, or stockholder of a corporation, in his own name or in the name of any member of his family for and on his behalf, directly or indirectly, in the business of supplying meat or other food products to the food service industry as defined herein, within the State of Nebraska for a period of 15 years from and after the date of the closing of this agreement as provided herein, and the bill of sale shall contain a similar restrictive covenant. . . .

"(c) The building presently occupied by Feerhusen, located upon the real estate described in Exhibit 'C', and used by him to conduct his business now known as 'Del Gould Meats' shall not directly or indirectly be leased by Feerhusen, or be permitted to be occupied or used by any person, firm or corporation in the business of supplying meat or other food products to the food service industry as defined herein, for a period of 15 years from and after the date of closing of this agreement as provided herein, except that Feerhusen may use all of the above-described premises in his contemplated business described above," i.e., fabrication, breaking, and jobbing.

Feerhusen also agreed to furnish customer lists and certain information concerning customers to Standard and to solicit these customers on behalf of

Standard. Standard agreed to employ Feerhusen as a consultant and public relations man for a period of 10 years at a salary of $1,100 per month and to pay him $5,000 per year thereafter for an additional 5-year period without any obligation on Feerhusen's part to perform any services during the 5-year period. Feerhusen agreed that during the 15-year period he would act in Standard's best interest and not compete in any way in serving the FSI. The sums to be paid to Feerhusen during the 15-year period were payable to his designated beneficiaries if he died during the period.

Paragraph 7 of the contract contained provisions pertaining to the purchase of the real estate in which Feerhusen conducted his business and this is the provision upon which Feerhusen primarily relies to support his position. Paragraph 7 provided: "In addition to agreeing not to lease Feerhusen's present building, directly or indirectly, to any person, firm or corporation supplying meat or other food products to persons engaged in the food service industry in the State of Nebraska for a period of 15 years from and after the closing of this agreement Feerhusen further agrees that Standard shall have the first option to purchase said building, . . . ." It also contained provisions regulating the exercise of the option. It further provided: "If no agreement can be reached within 90 days after Standard has advised Feerhusen of its intention to exercise said option, as provided hereinafter, then in that event Feerhusen shall be relieved of the obligation to sell said building to Standard and Feerhusen shall be free to sell said building to any other person, firm or corporation." This paragraph also contained the provision that the option would continue during the 15-year period even though Feerhusen should die during that time and gave to Standard the option to meet any bona fide offer which Feerhusen might receive for the purchase of the building.

The contract contained a provision in which Feerhusen agreed that Standard: ". . . may file with the appropriate public office or offices such affidavits or documents as may be necessary to afford public notice of the nature of this transaction and all of the terms thereof," and provided: "This contract shall, upon its execution, become binding and effective upon each of the parties hereto and their respective heirs, administrators, executors, successors and assigns."

After the contract was closed, the affidavit above contemplated was filed in the office of the recorder of deeds on August 18, 1971.

It is not disputed that Larry had actual and constructive notice of the restrictive provisions of the contract relative to the use and occupancy of the building. Larry owned 50 percent of the shares of stock of the corporation which carried on the "fabrication," "breaking," and "jobbing" business on the real estate involved. Feerhusen and his wife owned the other 50 percent of the shares.

In 1977, Feerhusen agreed to sell the building to Larry and invited Standard to exercise its option. Standard declined to do so. The Feerhusens gave notice to Standard that Larry intended to go into the business and use the building which he proposed to purchase for serving FSI customers. Standard protested and claimed that such use and occupation would constitute a violation of the agreement. This action resulted.

Reduced to its essence, the contention of the Feerhusens is that the promise restricting the use of the building applied only during such time as Feerhusen continued to own the building and that, upon the failure of Standard to exercise its option to purchase, Feerhusen was free to sell the building to anyone without restriction as to use even though the purchaser might have notice of Feerhusen's promise. The argument is based primarily upon this introduc-

tory language from paragraph 7: "In addition to agreeing *not to lease* Feerhusen's present building, directly or indirectly, to any person, . . . supplying . . . persons engaged in the food service industry in the State of Nebraska for a period of 15 years from and after the closing of this agreement. . . ." (Emphasis supplied.) Feerhusens contrast this language with the broader scope of Feerhusen's promises in paragraph 5 (c) restricting use of the building as follows: ". . . shall not directly or indirectly be leased by Feerhusen, or be permitted to be occupied or used by any person, firm or corporation in the business of supplying meat or other food products to the food service industry as defined herein, for a period of 15 years from and after the date of closing of this agreement," and argue that the omission of the more restrictive language from paragraph 7 which pertains to the purchase of the building is significant and must mean that, in the event of sale to a third party, the use of the building is to be unrestricted.

The Feerhusens cite and rely upon various canons pertaining to the construction of contracts. However, we find it necessary to cite only these principles. An interpretation of a written instrument should be made which will effect the true intention of the parties as expressed in the writing. Younker Brothers, Inc. v. Westroads, Inc., 196 Neb. 168, 241 N. W. 2d 679. Where a contract is ambiguous, the court must determine the intention of the parties and the ambiguity must be resolved so as to give effect to that intent. Frank McGill, Inc. v. Nucor Corp., 195 Neb. 448, 238 N. W. 2d 894. Just as in the case of interpreting ambiguous statutes, we believe that canons of construction are useful only insofar as they are an aid in determining intention. See Equal Opportunity Commission v. Weyerhaeuser Co., 198 Neb. 104, 251 N. W. 2d 730.

An examination of the entire contract leads us to the inescapable conclusion that the parties thereto

intended to restrict the use of the Feerhusen real estate during the entire 15-year period of noncompetition and not merely while Feerhusen continued to own the building. Several provisions of the contract to which we have already drawn attention are pertinent. The promise of Feerhusen in paragraph 5 (c) is not only not to lease, but also that he will not permit the building to "be occupied or used by any person," etc., in the business of supplying FSI. The contract provides that it shall bind not only the parties, but their successors and assigns. In paragraph 5 (i), Feerhusen specifically agrees that Standard may file in the appropriate public office affidavits or documents "as may be necessary to afford public notice of the nature of this transaction and all of the terms thereof." The principal and perhaps only conceivable reason for such a provision would seem to be to give notice under the recording statutes to persons who might purchase the real estate, if Standard did not. In addition, it appears Standard would not have expanded its own facilities, paid Feerhusen $30,000 for business assets, and in addition agreed to pay him the total sum of $157,000 over a 15-year period without assurance of freedom from such competition as Feerhusen could legally agree to. The evidence shows without contradiction that the personal services performed by Feerhusen under the contract continued only for a brief period of time and the inference is that such was the contemplation of the parties. Paragraph 7 might well have been more precisely drawn. However, we have no doubt, just as the trial court did not, that Feerhusen understood the building's use was to be restricted in the hands of his successors.

Contractual promises with respect to the use of land, which under the rules of equity are specifically enforceable against the promisor, are effective against the successors in title or possession if the successor has actual or constructive notice of the

promise. Under such circumstances, the promise subjects the land to an equitable servitude. Restatement, Property, Servitudes, § 539, p. 3226; Gillen-Crow Pharmacies, Inc. v. Mandzak, 5 Ohio St. 2d 201, 215 N. E. 2d 377; Sun Oil Co. v. Trent Auto Wash, 379 Mich. 182, 150 N. W. 2d 818. See, also, Restatement, Property, Servitudes, Part III, Promises Respecting the Use of Land, p. 3147.

Agreements not to compete which are reasonable in scope accompanying agreements for sale of a business are enforceable in equity, at least in the absence of an adequate legal remedy. D. W. Trowbridge Ford, Inc. v. Galyen, 200 Neb. 103, 262 N. W. 2d 442; Antrim v. Pittman, 189 Neb. 474, 203 N. W. 2d 510. In the case before us, no attack is made upon the reasonableness of the agreement.

AFFIRMED.