JOHN R. LAURITZEN, APPELLEE AND CROSS-APPELLANT, v. THOMAS L. DAVIS AND CAROL DAVIS WELLS, APPELLANTS AND CROSS-APPELLEES, FIRST NATIONAL BANK OF OMAHA ET AL., APPELLEES, RICHARD K. FLORY AND PATRICK M. CONWAY, APPELLEES AND CROSS-APPELLANTS.

335 N.W.2d 520

Filed June 10, 1983. No. 81-754.

Joseph K. Meusey and Steven R. Bloch of Fraser, Stryker, Veach, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellants.

Maureen E. McGrath of Kutak Rock & Huie, for appellee Lauritzen.

Mark Laughlin of Venteicher, Laughlin, Kulig & Lang, for appellees Flory and Conway.

Michael G. Helms of Schmid, Ford, Mooney & Frederick, for appellee First National Bank of Omaha.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, and SHANAHAN, JJ.

KRIVOSHA, C.J.

The appellee, John R. Lauritzen, commenced this action by filing a suit for declaratory judgment in the District Court for Douglas County, Nebraska, seeking a determination of his right to acquire 1,085.54 shares of the common stock of the First West Side Bank of Omaha. All of the other shareholders of the bank, including the executrix of the estate of Stanley J. Bednar, one of the selling shareholders, were joined as defendants. Following trial, the trial court held that Lauritzen held good title to 1,071.28 shares of the First West Side stock which he had earlier purchased from the estate of Stanley J. Bednar. The trial court further held that Richard K. Flory and Patrick M. Conway were not "stockholders" within the meaning of a certain agreement which granted to stockholders the right to purchase proportionate shares of stock of First West Side Bank in the event of a sale. Defendants Thomas L. Davis and Carol Davis Wells, surviving children of John F. Davis, have appealed, assigning as error the trial court's determination that Lauritzen holds good title to the 1,071.28 shares of First West Side Bank stock. The appellee Lauritzen has filed a cross-appeal on behalf of himself, Richard Flory, and Patrick Conway, contending that Flory and Conway did have a right to purchase stock. We believe that the decision of the trial court must be reversed in part and in part affirmed.

First West Side Bank was incorporated on February 16, 1954. The capital stock consisted of 1,000 shares with a par value of $100 each, for a total authorized capital of $100,000. With the exception of 30 shares that were issued to three qualifying directors,

the remainder of the stock was owned one-third each by John R. Lauritzen, his brother-in-law, John F. Davis, and his father-in-law, T. L. Davis. John Davis and John Lauritzen exercised joint control over the bank's affairs through their combined voting power and were both actively engaged in the management of the bank. The record clearly discloses that all significant decisions concerning the bank were made by Davis and Lauritzen and carried out under their direction by the officers of First West Side.

In February of 1955 T. L. Davis died and Lauritzen and Davis sold 40 percent of the bank's outstanding shares in order to acquire sufficient funds to pay the estate tax. The stock was sold to Stanley J. Bednar, Ernest T. Tanner, E. N. Solomon, Sr., and Donald W. Ryan. In December of 1956 Ryan sold his stock back, one-half each, to Lauritzen and Davis.

In October of 1955 James A. Irving was hired as president of First West Side, and Lauritzen and Davis each sold to Irving 40 shares of their own stock.

In 1960 First West Side applied for membership in the Federal Deposit Insurance Corporation and was required to increase its paid-in capital to qualify for membership. At a special meeting of stockholders held on October 13, 1960, the stockholders of First West Side voted to amend the bank's articles of incorporation to increase the capital stock to $500,000, to be represented by 25,000 shares of common stock having a par value of $20 per share. The increase was to be accomplished by the cancellation of all outstanding shares, the issuance of five new shares for each canceled share, the declaration of a 100-percent stock dividend, and the investment of $100,000 new capital by the sale of 5,000 newly authorized shares. These 5,000 shares were then offered proportionately to all of the shareholders. Stanley Bednar, Ernest and Josephine Tanner, E. N. Solomon, Sr., and E. N. Solomon, Jr., each invested

additional money and purchased a total of 1,500 shares. Irving also invested additional money at this time. The remaining shares were purchased equally by Davis and Lauritzen. After the capitalization Davis owned 7,750 shares. Lauritzen and corporations controlled by him also owned 7,750. This represented 62 percent of the outstanding stock. Irving held 2,000 shares representing 8 percent of the stock, and the other minority stockholders together held a total of 7,500 shares representing 30 percent of the stock.

At the time of the reorganization and recapitalization, on October 13, 1960, three agreements were executed. Lauritzen and Davis entered into an agreement (Davis agreement) which provided that during their joint lives they would offer to sell their own stock to each other before offering it to anyone else. If the other failed to purchase the stock, it was then to be offered to the minority stockholders before being offered to anyone outside the bank. Lauritzen and Davis could sell, transfer, or give shares of stock to their respective wives, children, or corporations in which they alone, or together with their wives and/or children, owned a controlling interest without first offering the stock to the other. However, any stock transferred to a wife, child, or controlled corporation was still subject to the agreement entered into between Lauritzen and Davis. Furthermore, the provisions of the Davis agreement were binding upon the executors, administrators, heirs, or assigns of the parties.

A second agreement was executed between Lauritzen and Davis, on the one hand, and Irving, on the other (Irving agreement). This was also done on October 13, 1960. The Irving agreement provided that in the event Irving wished to sell or transfer any stock, he must first offer to sell the stock to Lauritzen and Davis in equal amounts. Furthermore, if Irving should retire or his active participation in the bank's management be terminated, he was required

to offer to sell all of his stock to Lauritzen and Davis in equal amounts. Only in the event that either Lauritzen or Davis declined to purchase the half of the stock offered to him could the other buy the entire amount of the stock offered. The Irving agreement further provided that its benefits should inure to the personal representatives, heirs, or assigns of Lauritzen and Davis.

The third stock restriction agreement was executed by Stanley Bednar, Ernest and Josephine Tanner, E. N. Solomon, Sr., and E. N. Solomon, Jr. (Bednar agreement). This agreement was likewise executed on October 13, 1960. According to the agreement the minority stockholders agreed to first offer their shares to "all persons who are then stockholders" if they wished to sell or transfer stock or in the event their active participation in the bank should terminate. Any unsold shares must then be offered to Lauritzen and Davis on an equal basis. If either Lauritzen or Davis declined to purchase the stock, then the other could purchase the entire amount of stock offered. Only in the event that neither Lauritzen nor Davis purchased the stock was the minority stockholder free to sell his stock to whomever he pleased. This agreement further provided that its provisions were binding upon and would inure to the benefit of the executors, administrators, personal representatives, heirs, or successors of the parties.

Davis died on March 23, 1972, and all of his First West Side Bank stock passed into a marital trust for the benefit of his widow. Under the terms of the trust Mrs. Davis was free to withdraw the stock and sell it at any time or to appoint it by her will to anyone she desired. She later withdrew the stock from the marital trust and made a gift of one-half of those shares to her daughter, Carol Davis Wells, and the other half in trust for the benefit of her son, Thomas Davis. Mrs. Davis died on June 2, 1976.

On August 15, 1976, Stanley Bednar died. At the

time of his death he was the last signatory of the Bednar agreement still holding First West Side Bank stock. All the other signatories to the agreement had sold their shares, one-half to Lauritzen and one-half to Davis, prior to the death of John Davis. Bednar's daughter, Kay Bednar Neef, was appointed executrix of his estate.

In September of 1976 Neef sent a letter to each of the stockholders of record of First West Side Bank offering each a proportionate share of her father's 9,375 shares in accordance with what she believed to be the terms of the Bednar agreement. A total of 4,144.78 shares was offered to Lauritzen and corporations owned and controlled by him. Carol Davis Wells and Thomas Davis were each offered 2,072.34 shares. James Irving was offered 1,071.28 shares and Richard Flory and Patrick Conway were each offered 7.13 shares.

Lauritzen notified Neef that he wished to exercise his right to purchase all shares, both offered to him and those not acquired by other stockholders in accordance with the terms of the Bednar agreement.

James Irving declined to purchase the 1,071.28 shares offered and notified Neef of his decision on September 28, 1976. On September 29, 1976, Lauritzen notified Robert Johnson, vice president in charge of the First National Bank Trust Department and agent for the collection of sales proceeds and transfer of Bednar's stock, that he, Lauritzen, wished to exercise his right to purchase those unsold shares, and tendered full payment. The shares offered to Irving and declined were then transferred to Lauritzen on the stock records of the First West Side Bank.

Richard Flory and Patrick Conway both chose to purchase the 7.13 shares offered by the Bednar estate. In 1972 and in 1975, respectively, Conway and Flory had each been given 50 shares of stock by Lauritzen and Davis in order to qualify them as directors of First West Side Bank pursuant to the pro-

visions of Neb. Rev. Stat. § 8-126 (Reissue 1977), and the bank's corporate articles. These shares were subject to a restrictive agreement which stated that the transfer was necessary so that the donee would be the owner in his own name and right of the donated shares and that the stock certificates would be held in an escrow account at First National Bank subject to the direction of the donor only. While these shares were registered in Flory's and Conway's names on the stock record books and were voted by them at stockholders' meetings, until at least 1977 Conway always endorsed dividend checks received on the stock back to Lauritzen and to Davis' estate. On July 6, 1977, Lauritzen purchased the 14.26 shares from Flory and Conway.

In March of 1977 Carol Davis Wells and Thomas Davis made demand on Neef, as executrix of the Bednar estate, and on her agent, First National Bank, to sell them each one-fourth of the 9,375 shares offered by the estate. Apparently, their view was that because Irving, Flory, and Conway had not purchased proportionate shares of the stock offered by the Bednar estate, the Davis-Wells interest was entitled to purchase half of the shares pursuant to the agreements earlier signed by various of the parties.

Thereafter, on January 18, 1978, Lauritzen filed the declaratory judgment action involved in this case, seeking to have the Bednar agreement interpreted and to determine his rights in the 1,071.28 shares purchased from the Bednar estate as a result of Irving's declination, and his rights to the 14.26 shares purchased from Flory and Conway. As we have already noted, the trial court determined that Lauritzen held good title to the 1,071.28 shares which he had purchased from the Bednar estate by reason of the Irving declination. The basis of the court's ruling was that the rights given to Davis under the Bednar agreement to purchase one-half of any unsold stock were personal to him and therefore did

not survive his death. The trial court also found, however, that neither Flory nor Conway was entitled to purchase the 7.13 shares and ordered that half of the 14.26 shares be delivered to Wells and Davis and half to Lauritzen.

A number of errors are assigned by the various parties. In reality, however, but a single issue is involved. That issue requires the proper interpretation of the three agreements executed on October 13, 1960, by the various parties and the single question as to whether the rights granted to Davis under the Bednar agreement survived his death and passed to his heirs.

The relevant portion of the Bednar agreement provided in part as follows: "WHEREAS, it is the desire of the parties to assure the continuation of present stock ownership and management to the exclusion of possible investors or investment interests whose policies might not be to the best interests of the Bank . . .

. . . .

"1. In the event that any of the foregoing stockholders desire to transfer by sale or otherwise any of the shares of capital stock of the First West Side Bank or if for any reason their active participation in the Bank should terminate, such stockholder shall promptly give written notice constituting an offer to sell said stock to all persons who are then stockholders, and the stockholders to whom the offer is made shall have the right to purchase such stock at any time within six months after the offer is made. The offer to sell shall be applicable to all of the shares of capital stock of the First West Side Bank then held by the offering stockholder including the shares of stock held as of the date of this agreement as well as all other shares which may hereafter be acquired. Each stockholder, except the seller, shall have the right to purchase a proportion of such stock equal to the ratio of the number of shares owned by him to the total shares owned by the remaining

stockholders, excluding the seller, and if a stockholder is unable, unwilling, or neglects to buy the proportion of stock allotted to him then the selling stockholder must offer in writing to sell any unsold shares to John F. Davis and John R. Lauritzen on the basis of one half of the unsold shares to each or all of the unsold shares to either, should one of them decline to purchase said stock, and each of them shall have thirty days in addition to the six month period, above provided, to purchase said stock.

"2. Should none of the stockholders of the First West Side Bank desire to purchase the shares of stock of the selling shareholder and should both John F. Davis and John R. Lauritzen decline to purchase said stock, then all restrictions as to the sale of said stock shall no longer be binding upon the selling stockholder.

. . . .

"6. The provisions of this agreement are binding upon and shall inure to the benefit of the executors, administrators, personal representatives, heirs or successors of the parties to this agreement. The representative of the estate of any party to this agreement shall offer to sell such stock to the surviving stockholders in strict compliance with the foregoing terms of this agreement."

Relying upon our decision in *Schupack v. McDonald's Systems, Inc.*, 200 Neb. 485, 264 N.W.2d 827 (1978), Lauritzen contends that the right to purchase any unsold shares under the terms of the Bednar agreement was personal to Davis and did not survive his death. Wells and Davis argue, on the other hand, that the provisions of the Bednar agreement, when read in light of the Irving agreement and the Davis agreement, make it clear that the rights under the Bednar agreement were not personal and descended to the heirs of John Davis. Our reading of the three agreements makes it clear to us, in reviewing the appeal de novo as we are required to do, that the right granted to John Davis was not per-

sonal to him and did not terminate upon his death. The general rule has often been stated that, in the absence of anything to indicate a contrary intention, instruments executed at the same time by the same parties for the same purpose and in the course of the same transaction are, in the eyes of the law, one instrument and will be read and construed together as if they were as much one in form as they are in substance. See, *Bando v. Cole*, 197 Neb. 722, 250 N.W.2d 651 (1977); *Cedars Corp. v. H. Krasne & Son, Inc.*, 189 Neb. 220, 202 N.W.2d 205 (1972).

An examination of the three agreements executed on October 13, 1960, by the various parties indicates a common purpose, to wit, to place restrictions upon the sale or transfer of First West Side Bank stock in order to maintain joint control between the Davis and Lauritzen families and to insure that each family would have the opportunity to retain control of 50 percent of the stock of First West Side Bank in the event that other holders of minority interest desired to sell their interest in the bank or were otherwise terminated.

Under the terms of the Davis agreement each agreed that he would not sell any stock without first offering it to the other. However, during their lifetimes, they could transfer stock to wives, children, or companies controlled by them. Moreover, at the death of one of the parties, the executor, administrator, heirs, or assigns would be bound by the terms of the Davis agreement, and the survivor was assured that he would either own all of the stock or that the decedent's successors would be coowners. In essence, this agreement resulted in a guarantee of joint control between the Lauritzen family and the Davis family that would survive the death of either.

Likewise, the Irving agreement provided that before Irving could otherwise voluntarily dispose of his holdings or in the event of his termination of employment, he must offer his stock to Lauritzen and Davis in equal amounts. The benefits of the Irving agree-

ment expressly inure to the benefit of Lauritzen's and Davis' personal representatives, heirs, or assigns. The Irving agreement, therefore, likewise assured Lauritzen and Davis that their respective families could maintain joint control of First West Side Bank by equally acquiring shares otherwise held by Irving.

The Bednar agreement was simply the third leg of this stool. By requiring the minority shareholders to offer their stock in equal amounts to Lauritzen and Davis, the Bednar agreement assured that all the stock would eventually be returned to the Davis and Lauritzen families in equal amounts. Absent such an agreement, any one stockholder covered by the Bednar agreement could band with either Lauritzen or Davis and disrupt the careful formula otherwise provided for in both the Davis agreement and the Irving agreement. We cannot believe that such was the intention of the parties.

While it is true that neither Davis nor Lauritzen was a signatory to the Bednar agreement, they were unquestionably "parties" to the agreement. It seems clear beyond argument that Davis and Lauritzen were third-party beneficiaries of the Bednar agreement and were parties within its meaning in paragraph 6 of the Bednar agreement. Beneficiaries of a contract may recover thereon, though not named as parties, when it appears by express stipulation or by reasonable intendment that rights and interests of such beneficiaries were contemplated and being provided for thereon. See *Dworak v. Michals*, 211 Neb. 716, 320 N.W.2d 485 (1982).

Lauritzen's argument that the Bednar agreement was executed by the various parties for the benefit of the minority stockholders is simply not persuasive. It seems clear that the agreement was signed by the parties at the direction of and for the benefit of John F. Davis and John R. Lauritzen. The document itself was drafted by the bank's attorney

at Lauritzen's request and imposed restrictions on the sale or transfer of the shares held by the minority stockholders that would be beneficial to only Lauritzen and Davis. Paragraph 5 of the Bednar agreement makes that clear. Regardless of what anyone might offer to minority stockholders for the shares of the bank, Davis and Lauritzen were entitled to purchase the stock in accordance with a formula determined by virtually taking the book value of the stock rather than its market value. Rarely are bank stocks sold to disinterested third parties at book value. The minority stockholders who were parties to the Bednar agreement could not benefit by the provisions of paragraph 5; only Lauritzen and Davis could. We believe, therefore, that the rights of John Davis survived his death and passed to his heirs, who were entitled to acquire one-half of the shares not otherwise purchased by Irving, plus one-half of the remaining shares, for a total of 2,343.75 shares.

Having thus disposed of that issue, we now turn to the cross-appeal filed by Lauritzen, Flory, and Conway. Cross-appellants' principal complaint is that the trial court erred in admitting evidence of prior practical constructions of the Bednar agreement. We believe that their position is not correct. This court has often stated that a provision or term of a contract is ambiguous when, considered with other pertinent provisions as a whole, it is capable of being understood in more senses than one. See, *Lovelace v. Stern*, 207 Neb. 174, 297 N.W.2d 160 (1980); *Smith v. Wrehe*, 199 Neb. 753, 261 N.W.2d 620 (1978). Whether the parties to the Bednar agreement intended to include persons simply holding bare legal title to shares of stock for the sole purpose of qualifying them as directors within the class of persons identified as stockholders entitled to purchase stock is not clear from the instrument itself. As a result of this ambiguity, the instrument is open

to construction. *Pawnee Plastics, Inc. v. American Savings Co.*, 210 Neb. 131, 313 N.W.2d 262 (1981).

Furthermore, in interpreting a written contract, the meaning of which is in doubt and in dispute, the court, in order to determine its meaning, will consider all the facts and circumstances leading up to and attending its execution, and will consider the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract. *Younker Brothers, Inc. v. Westroads, Inc.*, 196 Neb. 168, 241 N.W.2d 679 (1976). In construing an ambiguous contract the court must determine the intent of the parties and resolve the ambiguity to give effect to that intent. *Pawnee Plastics, Inc. v. American Savings Co., supra; Standard Meat Co. v. Feerhusen*, 204 Neb. 325, 282 N.W.2d 34 (1979).

As we have already observed, the Bednar agreement was one of three components of Davis' and Lauritzen's comprehensive plan to maintain joint control of the bank between their two families and to insure that *all* the stock then held by minority stockholders would eventually be returned to the families in equal amounts. The Flory and Conway stock was subject to an agreement other and different than the three documents in question. Their certificates, though issued in their names, were held in escrow, subject to the following terms: "That said First National Bank of Omaha shall hold said stock subject to the direction in writing of only the Donor [Lauritzen and Davis] as to the disposition thereof, including the delivery thereof to the Donor, and such direction shall be completely determinative of Donee's rights in such stock." Nothing is said with regard to any future stock. Therefore, if qualifying directors were allowed to purchase stock under the terms of the Bednar agreement, this stock would not be subject to any restrictions whatsoever on subsequent sales and transfers and, in effect, would defeat the very careful plan otherwise set out in the three

agreements. This could not have been the intended purpose of these agreements.

Its intended effect is instead reflected in the manner in which prior sales by other signatories to the Bednar agreement were conducted. The evidence is undisputed that persons who held stock solely for the purpose of qualifying them as directors were never considered "stockholders" within the meaning of the Bednar agreement and were never offered shares of stock. The interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of true intent and should be given great, if not controlling, influence. *Strayer v. City of Omaha*, 209 Neb. 734, 311 N.W.2d 510 (1981); *D. K. Meyer Corp. v. Bevco, Inc.*, 206 Neb. 318, 292 N.W.2d 773 (1980).

After properly considering the past practices of the parties and the objectives of the stock restriction agreements, the trial court correctly found that Flory and Conway should not have been extended offers to purchase stock by the Bednar estate. Conway and Flory were not entitled to purchase stock from the Bednar estate, and, instead, shares offered to them should have been offered equally one-half to the heirs of John Davis and the other to Lauritzen and his various corporations.

Having thus purchased shares to which they were not entitled, a constructive trust was created. We have said that a constructive trust is a relationship, with respect to property, subjecting the person who holds title to property to an equitable duty to convey it to another on the ground that his acquisition or retention of the property would constitute unjust enrichment. *Nemaha Nat. Resources Dist. v. Neeman*, 210 Neb. 442, 315 N.W.2d 619 (1982). When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain a beneficial interest, equity converts him into a trustee. *Kuhlman v. Cargile*, 200 Neb. 150, 262 N.W.2d 454 (1978). The instant factual situation was

an appropriate one for the imposition of a constructive trust. The ownership of these 14.26 shares was sufficient to tip the balance of control and thereby disrupt the intent of the parties as evidenced by the three agreements.

For these reasons, therefore, the judgment of the trial court is in part reversed and remanded with directions and in part affirmed.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.

CAPORALE, J., not participating.

McCOWN, J., dissenting.

The majority opinion interprets a written contract executed by experienced, knowledgeable businessmen, and drawn by capable counsel, as having intended to include as third-party beneficiaries not only the two individuals named in the contract but an unknown number of unidentified heirs, devisees, or subsequent transferees of the two named individuals, even when no third-party beneficiary was a party to, or signer of, the agreement, and no signer of the agreement is a party to this lawsuit.

In my opinion the contract means exactly what it says, and the language of the detailed and extended decree of the trial court effectively sets out the reasons for that opinion.

"[T]he Court finds, both from the express language of the Bednar Agreement and from the circumstances attending its execution, that the rights which were given to John F. Davis to purchase half of any FWSB stock not purchased by other stockholders were personal to him and, as such, did not survive his death and are not held by any of the Defendants. This finding is based upon, but not limited to, the following facts:

"(a) The Bednar Agreement expressly covers the subject of who is entitled to purchase any unsold shares that are not purchased by 'John F. Davis'. The Agreement expressly gives that right to John R. Lauritzen by stating that the right to purchase all

unsold shares belongs to 'John F. Davis and John R. Lauritzen' in equal amounts, but that 'all' such shares could be purchased by 'either', should 'one *of them*' decline to purchase. It is clear, therefore, that if 'one of them' (i.e., Davis) does not purchase his half, the other 'of them' (i.e., Lauritzen) is entitled under the contract to purchase all such shares. No third person, such as a Davis heir, can, therefore, claim entitlement to purchase in advance of Lauritzen should John F. Davis fail to personally take his half.

"(b) The Agreement expresses the intent that the right to purchase unsold shares must be *personally* exercised by Davis and Lauritzen. The Agreement identifies Davis and Lauritzen by name and provides that each '*of them*' would have the right to purchase any shares not purchased by the other and that 'each *of them*' would have an additional 30 days to exercise that right. The Agreement further provides that it is not mandatory that any shares 'must be purchased by . . . John F. Davis and John R. Lauritzen' and if 'both John F. Davis and John R. Lauritzen decline to purchase' then the restrictions imposed by the Agreement are no longer binding on the seller.

"(c) By providing that John R. Lauritzen should have the right to purchase stock not purchased by John F. Davis, the Bednar Agreement expressly precluded Davis from transferring his right to purchase unsold shares to his heirs or devisees since such a transfer would defeat Lauritzen's alternate contractual right to purchase such shares.

"(d) Although the Agreement expressly names Davis and Lauritzen as third party beneficiaries, it does not provide for their heirs or executors, as do the Davis-Lauritzen Agreement and the Irving Agreement; instead, it provides *only* for the heirs and executors 'of the parties' in identifying who shall receive the benefits of the Agreement in the event of death. Since death was an event contem-

plated by the Agreement and since Lauritzen and Davis are not 'parties' to the Agreement, it is evident that their heirs and executors were excluded, for whatever reason, from succeeding to the benefits of the Agreement.

"(e) The circumstances surrounding the execution of the Bednar Agreement indicate the rights given to Davis and Lauritzen, or either of them, to purchase unsold stock were intended to be personal to them. The Agreement was executed by persons who were minority stockholders of FWSB with no power of control. In spite of their inability to control the Bank, these persons were, nevertheless, investing additional funds of their own into the capital of the Bank. These minority shareholders had placed their total confidence in John F. Davis and Lauritzen's personal abilities, banking expertise and management skills and were looking to John F. Davis and Lauritzen to utilize those personal abilities and skills to assure and safeguard the continued value of the minority investment. It is apparent that John F. Davis and Lauritzen were personally named in the Agreement as the two individuals who would have the last opportunity (either jointly or severally) to purchase any unsold stock because the minority wanted the protection of having any unsold stock offered first to the active overseeing managers of the Bank in whom they had placed their confidence before the restrictions of the Agreement lapsed and the shares could be offered to outside investors.

"(f) There is no evidence whatsoever that in executing the Agreement the minority stockholders had any intention of, or gave any thought to, conferring any benefits on the heirs, wives or children of either John F. Davis or Lauritzen, who admit they were never active in the management of the Bank. In fact, the testimony of the surviving signatories of the Agreement is that they had no such intention.

"(g) If the Court were to adopt the position urged

by the Defendants and find that the rights given to 'John F. Davis' to purchase unsold shares were intended to extend to his personal representatives, successors and heirs so that, upon a failure of John F. Davis to personally exercise his right, those persons could purchase ahead of Lauritzen, the Court would have to expand the express restrictions imposed by the Agreement both in scope and in time by enlarging the beneficiary class from the two named beneficiaries to a class consisting of those two individuals plus an unknown number of unidentified heirs, devisees or subsequent transferees of those two individuals, all of whom would have been unidentifiable by the signatory parties at the time the Agreement was executed. This form of contract construction would not only be contrary to the purposes expressed in the Agreement, but it would also be contrary to the rule that stock restriction agreements (which are restraints on alienation) are to be strictly construed and are not to be expanded in scope or increased in extent beyond their plain meaning. 12 Fletcher *Cyclopedia of Corporations* §5461.6, p. 215. Such a construction would also require the Court to find, without any supporting evidence and therefore, contrary to Nebraska law (*Swift Lumber & Fuel v. Hock*, 124 Neb. 30, 345 N.W.2d [sic] 3 (1932)), that the Defendants Thomas L. Davis and Carol Davis Wells and the Davis Executors and Trustees, although not identified as beneficiaries in the Agreement either by name or as a class, were *intended* third party beneficiaries of the Agreement. The Court rejects these suggested methods of construction as unsound and erroneous.

"40. Accordingly, the Court finds that at the time of the death of Stanley J. Bednar, John F. Davis being previously deceased, Plaintiff John R. Lauritzen was the sole surviving third party beneficiary of the Bednar Agreement who had any right to purchase the 1,071.28 shares of stock which James Irving declined to buy, and the Court further finds that

Plaintiff Lauritzen holds good title to those 1,071.28 shares. The claims which the Defendants have asserted to one-half of those shares are, therefore, held to be without merit and unenforceable herein."

I find no legal or equitable justification for rewriting a detailed and carefully drawn written contract between minority shareholders simply because it did not contain a provision which was included in two other majority shareholder agreements executed by different parties. There is simply no basis for holding that the parties to the Bednar agreement actually intended to say something different than what they actually said. In my view the decree of the trial court was eminently correct and should have been affirmed.