GARY'S IMPLEMENT, INC., APPELLEE, v. BRIDGEPORT TRACTOR PARTS, INC., FORMERLY KNOWN AS GARY'S TRACTOR PARTS, INC., APPELLANT.

702 N.W.2d 355

Filed July 29, 2005.    Nos. S-03-941, S-03-1242.

Jerrold L. Strasheim and Mary Leiter Swick, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, L.L.P., and

James L. Zimmerman, of Sorensen, Zimmerman & Mickey, P.C., for appellant.

Howard P. Olsen, Jr., and John F. Simmons, of Simmons Olsen Law Firm, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

## NATURE OF CASE

This contract case, embodied in cases Nos. S-03-941 and S-03-1242, generally involves one transaction, the sale of a business by appellee, Gary's Implement, Inc. (Seller), to appellant, Bridgeport Tractor Parts, Inc. (Buyer). The transaction was accomplished by execution of several documents on July 15, 1998. The three documents critical to this appeal are labeled: "Agreement," "Promissory Note," and "Non-Competition Agreement." The three documents refer variously to one another. In this lawsuit, Seller generally claimed that Buyer failed to make certain payments due after the sale, and Buyer generally alleged and counterclaimed that Seller improperly competed with it and failed to deliver goodwill and that, therefore, its obligation to make periodic payments to Seller was excused. Buyer sought damages. Buyer did not seek rescission. Buyer's counterclaim was rejected by a jury, Seller's claims were successful before the court, and judgment in favor of Seller in the amounts of $612,225 and $20,000 on the Promissory Note and Non-Competition Agreement, respectively, plus interest, was entered by the district court for Morrill County. Buyer appeals. As explained below, we reverse and vacate, and remand for further proceedings.

## SUMMARY OF CASE

The business underlying the transaction involved agricultural equipment, more particularly, Seller's "salvage and used parts business." In summary, the total purchase price of $1,050,000 was allocated and payable as follows: pursuant to the Agreement, $525,000 was allocated to equipment and inventory to be paid at closing; pursuant to the agreements, $500,000 was allocated to the sale of goodwill to be paid pursuant to the Promissory Note

over 5 years; and, pursuant to the Non-Competition Agreement, $25,000 was allocated to Seller's agreement to not compete with Buyer, payable over 5 years.

On October 5, 2000, Seller filed a petition against Buyer in the district court for Morrill County. The petition contained two breach of contract "causes of action." In its petition, Seller alleged that Buyer had failed to make the separate payments due in 2000 under the Promissory Note and the Non-Competition Agreement. In its answer, Buyer alleged that its obligation to make these payments had been excused as a result of Seller's violation of the Non-Competition Agreement and Seller's failure to transfer goodwill, the purchase of which was reflected in the Promissory Note. Buyer alleged it had been damaged. Buyer also filed a counterclaim against Seller. In its counterclaim, Buyer alleged that Seller had breached the Non-Competition Agreement and other promises and sought damages therefor. In view of our disposition of the case, we do not comment on Buyer's claims for damages.

A trial was conducted over several days. The issue raised in Buyer's counterclaim as to whether Seller had breached the Non-Competition Agreement was given to the jury, and the issues raised in Seller's petition as to whether Buyer had violated its payment obligations under the Promissory Note and the Non-Competition Agreement were ultimately decided by the court. The parties do not disagree on appeal with the case having been submitted in this fashion.

During the trial, the parties and the court dedicated considerable time to the meaning of the Non-Competition Agreement and, in particular, to the nature of the business activities not subject to the Non-Competition Agreement and therefore reserved to Seller. After concluding that the Non-Competition Agreement was valid, the court instructed the jury on the meaning of the Non-Competition Agreement and submitted to the jury Buyer's counterclaim that alleged Seller had breached the Non-Competition Agreement and that Buyer had been damaged thereby. In its instruction summarizing and paraphrasing the Non-Competition Agreement, the court inserted additional language not found in the Non-Competition Agreement. After being so instructed, the jury rejected Buyer's counterclaim.

Pursuant to the jury's verdict on the counterclaim, on July 22, 2003, the district court entered judgment in favor of Seller on Buyer's counterclaim and in addition found in favor of Seller on its contract claims that alleged that Buyer's failure to make payments violated the Promissory Note and the Non-Competition Agreement. The court entered monetary judgment in favor of Seller on these breach of contract claims. Buyer appeals.

As explained below, we conclude that by virtue of its orders and instructions to the jury, the district court concluded that the Non-Competition Agreement was ambiguous, and we do not disagree with this conclusion. However, because the interpretation of the ambiguous Non-Competition Agreement was a question of fact that should have been determined by the jury, we conclude that the district court committed prejudicial error when it instructed the jury as to the meaning of certain provisions within the ambiguous Non-Competition Agreement. Because of this prejudicial error, judgment based on the verdict on the counterclaim must be reversed and vacated, and Buyer's counterclaim must be properly resubmitted to a jury. Further, it logically follows that the judgment in favor of Seller on its contract claim based on Buyer's failure to make payments under the Non-Competition Agreement must be reversed, and the resolution of this claim must await a proper jury outcome on Buyer's counterclaim.

As explained below, we further determine that in this transaction, the Promissory Note representing the sale of goodwill by Seller is inextricably intertwined with Seller's contractual obligation not to compete as embodied in the Non-Competition Agreement. Thus, the issue of whether the Promissory Note should be enforced as Seller seeks or whether Buyer's payment obligation under the Promissory Note should be excused or reduced by a damage award or setoff must necessarily follow a proper resolution of Buyer's counterclaim alleging that Seller violated the Non-Competition Agreement. We therefore conclude that the district court erred in entering judgment in favor of Seller on its breach of contract claim based on Buyer's failure to make payments under the Promissory Note and that such judgment must be reversed and vacated.

In summary, we reverse and vacate the judgment of the district court entered in favor of Seller on its petition and against Buyer

on its counterclaim and remand the causes for further proceedings consistent with this opinion.

## STATEMENT OF FACTS

Seller is owned by Gary and Joan Phillips and has been doing business in Bridgeport, Morrill County, Nebraska, since approximately 1970. The record reflects that Seller was engaged in at least two separate businesses, a salvage and used parts yard, and a used whole goods business, sometimes referred to as the "sales business," which sold used tractors, trucks, and farm equipment. On July 15, 1998, Seller entered into the Agreement with Buyer, by which Seller sold its "salvage and used parts business in Morrill County, Nebraska (the 'Salvage Business')" to Buyer for a total purchase price of $1,050,000.

The terms of the transaction were carried out in three separate but interrelated documents: the Agreement, the Promissory Note, and the Non-Competition Agreement, all executed on July 15, 1998. The Agreement refers to and incorporates the Promissory Note and the Non-Competition Agreement, both of which are attached as exhibits to the Agreement. The Promissory Note refers to the Agreement. The Non-Competition Agreement refers to the Agreement and the Promissory Note.

Pursuant to the Agreement, Buyer purchased the following assets of the Salvage Business: (1) the equipment, motor vehicles, bookkeeping computer system, and radios used by Seller in the Salvage Business (the equipment); (2) the inventory of the Salvage Business; and (3) all goodwill and other intangible assets of the Salvage Business, including all customer lists and customer names (goodwill). Certain of Seller's assets were specifically excluded from the sale, including all of Seller's assets associated with Seller's business of selling whole used farm equipment and trucks.

Under the provisions of the Agreement, the purchase price for the sale was allocated and was to be paid by Buyer as follows:

(1) $525,000 was allocated to the purchase of Seller's equipment and inventory and was to be paid at the closing.

(2) $500,000 was allocated to the purchase of Seller's goodwill. This sum was to be paid in annual payments of $100,000 plus interest at the rate of 6 percent per annum. The first payment was due 1 year after the closing, with additional payments

due on the same day of each subsequent year until paid in full. This amount was evidenced by the Promissory Note. Under the terms of the Promissory Note, Seller was to provide Buyer with "30 days of written notice" to cure any default under the Promissory Note.

(3) $25,000 was allocated to the Non-Competition Agreement to be executed by Seller and the Phillipses. Buyer agreed to pay Seller and the Phillipses $5,000 per year for 5 years, with the first payment due 1 year from the date of the execution of the Non-Competition Agreement, and with each additional payment due on the same day of each subsequent year.

The Non-Competition Agreement provided in pertinent part as follows:

> 1. [Seller and the Phillipses] will not, directly or indirectly, for a period of 5 years from the Closing Date:
> a. manage, operate, join, control, own, be an employee of, participate or become interested in or be connected with, as a partner, owner, member, shareholder, director, officer, employer or investor, or in any other individual or representative capacity, or otherwise;
> b. lend credit or money for the purpose of establishing, operating or otherwise finance;
> c. furnish consultation or advice to;
> d. sell services on behalf of; or
> e. permit their name(s) to be used by anyone other than Buyer, or its successors and assigns;
> in connection with any business, partnership, joint venture, corporation, trust or other organization or entity (other than that of Buyer) engaged in the agricultural and machinery salvage and used, new or rebuilt agricultural parts business within 150 miles of Bridgeport, Nebraska.

Paragraph 5 of the Non-Competition Agreement contained the following exceptions:

> 5. Notwithstanding any other provision to the contrary, this Non-Competition Agreement shall not restrict the following actions of Seller and/or [the Phillipses]:
> a. The purchase and sale of antique (1961 and prior year [sic]) vehicle or machinery parts.
> b. The purchase and sale of cores on a wholesale basis.

Paragraph 6 of the Non-Competition Agreement provided that in the event Seller violated the Non-Competition Agreement, "Buyer . . . shall have a cause of action for any damages caused by the competition . . . ."

As stated above, on July 15, 1998, Seller and Buyer executed the Agreement. On the same day, Seller, the Phillipses, and Buyer executed the Non-Competition Agreement, and Buyer executed the Promissory Note. Also on July 15, Buyer paid Seller the $525,000 due under the Agreement for the equipment and inventory of the Salvage Business.

Following its purchase of Seller's Salvage Business, Buyer became concerned that Seller and/or the Phillipses were violating the Agreement and Non-Competition Agreement by salvaging and selling used, nonantique parts; by competing with Buyer for the supply of salvage tractors and machinery; and by trading on the goodwill that Seller had sold to Buyer. This concern arose, in part, due to a series of advertisements Seller published in the Bridgeport area. One of these advertisements, published on November 7, 1998, stated "Save 50% to 80% on used tractor, harvest and farm equipment parts." Despite these concerns, on July 15, 1999, Buyer paid Seller $105,000, in accordance with the terms of the Promissory Note and the Non-Competition Agreement.

Buyer's concerns about Seller's adherence to the Agreement and Non-Competition Agreement continued after the July 1999 payment, and David Dyke, one of Buyer's owners, had several conversations with Gary Phillips in regard to this perceived competition. On June 27, 2000, Buyer, through its attorneys, sent a letter to Seller and the Phillipses, stating, in part, as follows:

> [Seller and Gary Phillips] are currently engaging in direct competition with [Buyer] with respect to operating a salvage and used parts business. We understand you are purchasing salvage and used parts inventory and that you are selling the same to the general public to the damage and detriment of [Buyer].

The letter further provided that as a result of

> such salvage and used parts business, [Seller and Gary Phillips] are in default of the Non-Competition Agreement and your agreement to sell [Buyer] the goodwill associated

> with the salvage and used parts business purchased by [Buyer]. Because you are selling salvage parts and used parts from [Seller] you are essentially capitalizing on the "goodwill" which you sold to [Buyer].

The letter demanded that "salvage and used parts business activities" engaged in by Seller and the Phillipses cease immediately. The letter further stated that in the event such "competitive activity" did not cease, Buyer would deem the "Non-Competition agreement and the agreement to sell goodwill to have been breached" and that as a result, Buyer would not make the July 15, 2000, payments called for under the Non-Competition Agreement or the Promissory Note. On July 15, Buyer did not pay Seller the payments provided for under the Non-Competition Agreement and the Promissory Note.

On July 21, 2000, the attorney for Seller and the Phillipses sent a letter to Buyer's counsel enclosing a "Notice of Nonpayment" as a result of Buyer's failure to pay the July 15 payments. Payments were not forthcoming. On October 5, Seller filed suit against Buyer in the district court for Morrill County. In its petition, Seller asserted two causes of action against Buyer. The first cause of action alleged, in summary, that Buyer had breached "the Agreement and the terms of the [Promissory] Note" by failing to make the July 15, 2000, payment of $100,000. The second cause of action alleged, in summary, that Buyer had breached the Non-Competition Agreement by failing to make the July 15, 2000, payment of $5,000. For relief, Seller sought the balance due under the Promissory Note and interest, the $5,000 due under the Non-Competition Agreement, and postjudgment interest on the Non-Competition Agreement.

On October 31, 2000, Buyer filed its "Answer and Counterclaim." Buyer denied that it had breached either the Promissory Note or the Non-Competition Agreement. Buyer further alleged, in summary, that Seller had competed against Buyer in violation of Seller's agreement to sell its goodwill to Buyer and in violation of Seller's agreement not to compete with Buyer. Buyer alleged that as a result of this competition, Seller had breached the Agreement and the Non-Competition Agreement and that, therefore, Buyer asserted it was excused from making payments to Seller under the Non-Competition Agreement and

the Promissory Note. Buyer alleged it had been damaged. For its counterclaim, Buyer alleged that Seller had breached the Agreement and the Non-Competition Agreement and that Buyer had been damaged thereby, which damages included revenue and inventory losses. For relief, Buyer sought, inter alia, the dismissal of Seller's petition with prejudice, a finding that Seller had materially breached the Agreement and the Non-Competition Agreement, a finding that Buyer was no longer obligated to make payments due under the various agreements, and damages Buyer had allegedly sustained as a result of Seller's breaches of the agreements. Buyer did not seek rescission. Seller replied, inter alia, that Buyer had waived its rights under the Non-Competition Agreement by modifying its terms.

The case came on for a jury trial beginning on July 14, 2003, and continuing through July 17. A total of 15 witnesses testified, and over 100 exhibits were offered into evidence. The issue in Buyer's counterclaim alleging that Seller had violated the Non-Competition Agreement was given to the jury, and the issues of whether Buyer had violated its obligations under the Promissory Note and the Non-Competition Agreement were presented to the court.

During the trial, considerable evidence was adduced from the parties describing what the parties believed to be the nature of the Salvage Business sold to Buyer and the nature of the business that had been excepted from the Non-Competition Agreement and retained by Seller. In this regard, Joan Phillips testified that Buyer purchased "the business of the used parts business and the salvage inventory that supported this business" from Seller. She further testified as to her understanding of the term "salvaging," stating that it meant "[t]aking a part off of a piece of equipment" to either sell individually or use to restore another piece of equipment. She stated that after Seller sold the Salvage Business to Buyer, Seller continued to buy salvage machinery and tractors to "backup [Seller's] whole goods business" that had been retained by Seller after its sale of the Salvage Business to Buyer. According to Joan Phillips, Seller would take parts off the salvage machinery and tractors it purchased and use those parts to restore or refurbish the used whole goods which Seller sold as part of its "whole goods operation." Joan Phillips further testified

that "[w]e agreed in the noncompete not to compete against them in the used parts business."

Gary Phillips also testified concerning Seller's business activities after it sold the Salvage Business to Buyer. On direct examination, in response to the question whether Seller continued to operate the used parts business that was sold to Buyer, Gary Phillips testified that "[w]e operated it for our own in-house use on tractors that we were rebuilding." On cross-examination, Gary Phillips agreed that Seller would buy farm equipment to salvage parts for other farm equipment that Seller was refurbishing. When asked whether that conduct constituted "salvaging," Gary Phillips said "[y]es" and stated that "[t]hat was part of the business we reserved."

Dyke testified that he was concerned with Seller's competition with Buyer following Buyer's purchase of the Salvage Business. According to Dyke, Seller's purchase of salvage tractors and equipment conflicted with the goodwill that Seller had sold to Buyer. With regard to the goodwill that Seller had prior to the sale, Dyke testified that Gary Phillips indicated that he

> knew everybody and everything that had to do with the farm machinery company in this entire region. He could introduce me to people to buy salvage, he could introduce me to the dealers that traded him salvage . . . he could identify what type of the machinery, where to locate it.

In the course of the trial, the district court entered a one-page order dated July 14, 2003, interpreting paragraph 5 of the Non-Competition Agreement. Regarding the activities reserved to Seller, the court ruled:

> "Notwithstanding any other provision to the contrary, this Non-Competition Agreement shall not restrict the following actions of [S]eller and/or [the Phillipses]: a) the purchase and sale of antique (1961 and prior year [sic]) vehicle or machinery parts . . ." contemplated that [Seller] could salvage parts as long as they were 1961 or prior.

At the close of evidence, the district court instructed the jury. In instruction No. 9, the substance of which Buyer objected to, the district court instructed the jury that Seller's breach of contract claims were a matter for the court to decide, stating:

The Court has determined as a matter of law that the instruments alleged by [Seller] and admitted by [Buyer] are valid and that [Buyer] did not make the payments which were due on July 15, 2000. The Court will determine what are the rights and obligations of the parties in light of these facts. The matter which you must decide is [Buyer's] Counterclaim.

In instructing the jury on the counterclaim, the district court stated in Instruction No. 9 as follows:

The interpretation of [the Non-Competition Agreement] is [the court's] responsibility. You are to determine whether the non-competition agreement was breached. Insofar as relevant to the question which you must decide, you are instructed that the proper interpretation of the non-competition agreement is as follows:

1. The agreement did not restrict [Seller's] purchase, sale, *or salvage* of antique vehicle or machinery parts (1961 and prior years);

2. The agreement permitted [Seller] to retain its sales business which was the sale of used and rebuilt machinery *to include the salvage function that supported that business*; and

3. The non-competition agreement was not effective and did not restrict [Seller's] activities in any way at any time after August 20, 2000.

(Emphasis supplied.)

The jury was also instructed on Seller's defense that Buyer had waived any of Seller's breaches of the Non-Competition Agreement and further instructed on Buyer's damage claim for "the reasonable value of the profits it has lost."

The case was given to the jury at approximately 3:30 p.m. on July 17, 2003. By 7:35 p.m., the jury had returned a unanimous verdict in favor of Seller on Buyer's counterclaim, finding that Buyer had not met its burden of proof. In view of the verdict, the jury did not reach the issue of damages, if any, suffered by Buyer. In accordance with the jury verdict, the district court entered judgment in favor of Seller and against Buyer on Buyer's counterclaim. Thereafter, the district court entered judgment in favor of Seller and against Buyer in the amounts of

$612,225 on the Promissory Note and $20,000 on the Non-Competition Agreement, plus interest from and after the judgment date. Buyer appealed.

## ASSIGNMENTS OF ERROR

On appeal, Buyer assigns three errors. Buyer claims, renumbered and restated, that the district court erred (1) in failing to submit Buyer's entire counterclaim to the jury, incorrectly instructing the jury on the counterclaim, and entering judgment against it on its counterclaim; (2) in entering judgment in Seller's favor on its breach of contract claims; and (3) in awarding Seller double satisfaction of its claims and subjecting Buyer to forfeiture.

## STANDARDS OF REVIEW

The meaning of a contract and whether a contract is ambiguous are questions of law. *Big River Constr. Co. v. L & H Properties*, 268 Neb. 207, 681 N.W.2d 751 (2004); *Wood v. Wood*, 266 Neb. 580, 667 N.W.2d 235 (2003). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Id.*

In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Pribil v. Koinzan*, 266 Neb. 222, 665 N.W.2d 567 (2003).

## ANALYSIS

*The Jury Was Improperly Instructed on Buyer's Counterclaim and the District Court Erred in Entering Judgment Against Buyer on Its Counterclaim and in Favor of Seller on Its Contract Claim Based on the Non-Competition Agreement.*

We first address Buyer's claim that the district court incorrectly instructed the jury on its counterclaim, because resolution of this issue is dispositive of this case. On appeal, Buyer asserts that the district court erred when it instructed the jury in instruction No. 9 with regard to the meaning of the Non-Competition Agreement. Specifically, Buyer argues that the district court prejudicially erred when it added to instruction No. 9 the terms "salvage" and "salvage function that supported that business" to

the business activities retained by Seller in paragraph 5 of the Non-Competition Agreement. We agree with Buyer that instruction No. 9 constituted prejudicial error requiring that the judgment in favor of Seller and against Buyer on Buyer's counterclaim be reversed and vacated. Buyer also argues that as a consequence of a reversal of the judgment on the counterclaim, a corresponding reversal of entry of judgment in favor of Seller on its breach of contract claim based on the Non-Competition Agreement is also required. We agree that the resolution of Seller's breach of contract claim based on Buyer's failure to make payments under the Non-Competition Agreement must await proper resolution of the counterclaim, and therefore, the judgment in favor of Seller based on Buyer's alleged violation of the Non-Competition Agreement is also reversed and vacated.

Initially, we note that there is no claim by either party that the Non-Competition Agreement was not valid. The rules of law applicable to this contract case are familiar. A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 655 N.W.2d 390 (2003). However, a contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Jensen v. Board of Regents*, 268 Neb. 512, 684 N.W.2d 537 (2004). Whether a contract is ambiguous is a matter of law. *Big River Constr. Co. v. L & H Properties*, 268 Neb. 207, 681 N.W.2d 751 (2004). The meaning of an ambiguous contract is generally a question of fact. *Kropp v. Grand Island Pub. Sch. Dist. No. 2*, 246 Neb. 138, 517 N.W.2d 113 (1994).

We have stated that a court is not free to rewrite a contract or to speculate as to terms of the contract which the parties have not seen fit to include. *Honda Cars of Bellevue v. American Honda Motor Co.*, 261 Neb. 923, 628 N.W.2d 661 (2001). Rather, when a court has determined that ambiguity exists in a document, an interpretative meaning for the ambiguous word, phrase, or provision in the document is a question of fact for the fact finder. *Dammann v. Litty*, 234 Neb. 664, 452 N.W.2d 522 (1990). In this regard, we have stated in a jury case that when the terms of the contract are in dispute and the real intentions of the

parties cannot be determined from the words used, the jury, not the court, should determine the issue from all the facts and circumstances. *Luschen Bldg. Assn. v. Fleming Cos.*, 226 Neb. 840, 415 N.W.2d 453 (1987).

In the instant case, it is apparent that the district court, through its July 14, 2003, order and instruction No. 9, effectively concluded that the Non-Competition Agreement was ambiguous and supplied terms to the Non-Competition Agreement which the parties had not included. As noted, paragraph 1 of the Non-Competition Agreement prohibited Seller and the Phillipses from competing with Buyer "in the agricultural and machinery salvage and used, new or rebuilt agricultural parts business within 150 miles of Bridgeport, Nebraska" for a period of 5 years. The Non-Competition Agreement, however, contained the following exceptions:

> 5. Notwithstanding any other provision to the contrary, this Non-Competition Agreement shall not restrict the following actions of Seller and/or [the Phillipses]:
> a. The purchase and sale of antique (1961 and prior year [sic]) vehicle or machinery parts.
> b. The purchase and sale of cores on a wholesale basis.

The Non-Competition Agreement did not provide an explanation as to the meaning of these two exceptions. However, during the trial, the district court in its order of July 14 concluded, inter alia, that paragraph 5 of the Non-Competition Agreement "contemplated that [Seller] could salvage parts."

Consistent with its July 14, 2003, ruling, in instruction No. 9, when advising the jury on Buyer's counterclaim, the district court instructed the jury that

> the proper interpretation of the non-competition agreement is as follows:
> 1. The agreement did not restrict [Seller's] purchase, sale, *or salvage* of antique vehicle or machinery parts (1961 and prior years);
> 2. The agreement permitted [Seller] to retain its sales business which was the sale of used and rebuilt machinery *to include the salvage function that supported that business.*

(Emphasis supplied.) In this instruction, the district court added the language "salvage" and "salvage function that supported that

business" to paragraph 5 of the Non-Competition Agreement. Upon our review of the district court's rulings and in particular instruction No. 9, we determine that the district court effectively concluded that the Non-Competition Agreement was ambiguous and that despite that conclusion, through instruction No. 9, interpreted the Non-Competition Agreement, whereas it should have given the issue of the meaning of the ambiguous Non-Competition Agreement to the jury.

The meaning of a contract, and whether a contract is ambiguous, are questions of law. *Big River Constr. Co. v. L & H Properties*, 268 Neb. 207, 681 N.W.2d 751 (2004). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Id.* In reviewing the district court's decision that the Non-Competition Agreement was ambiguous, we conclude that the district court did not err. However, once the district court determined that the Non-Competition Agreement was ambiguous, and given the record as we read it, the meaning of the ambiguous contract became a question of fact for the fact finder. See *Dammann v. Litty*, 234 Neb. 664, 452 N.W.2d 522 (1990). Because it was the role of the jury and not the court to determine the meaning of the ambiguous contract from all the facts and circumstances, the district court erred in instructing the jury as it did in instruction No. 9. See *Luschen Bldg. Assn. v. Fleming Cos.*, 226 Neb. 840, 415 N.W.2d 453 (1987).

In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Pribil v. Koinzan*, 266 Neb. 222, 665 N.W.2d 567 (2003). When the error in this case consisted of supplying terms to an ambiguous contract in the jury instruction, such error cannot be cured by the giving of other jury instructions. This is so because such an error consists not in the omission of some material fact, but in the affirmative statement by the court as to the existence of a fact which the jury ought to decide. See *Wilch v. Western Asphalt Paving Corporation*, 124 Neb. 177, 245 N.W. 605 (1932). See, also, *Platte Valley Public Power & Irr. Dist. v. Armstrong*, 159 Neb. 609, 68 N.W.2d 200 (1955); *Nocita v. Guiliano*, 130 Neb. 241,

264 N.W. 672 (1936). We conclude that the error in the giving of instruction No. 9 was prejudicial.

In concluding that instruction No. 9 was prejudicial error, we note that Buyer introduced evidence on its counterclaim designed to show that Seller was buying used tractors and equipment in order to salvage parts to support its whole goods business and that such salvage activity violated the Non-Competition Agreement. Despite Buyer's allegations, by instructing the jury that paragraph 5 of the Non-Competition Agreement permitted Seller to conduct the salvage activity demonstrated by Buyer's evidence, there was little if anything factually for the jury to decide on Buyer's counterclaim. The district court incorrectly removed an issue from the jury and in effect instructed the jury that Seller had not violated the Non-Competition Agreement. Therefore, as noted above, instruction No. 9 constituted prejudicial error that we determine requires reversal of the judgment dismissing the counterclaim entered upon the jury verdict.

As a consequence of this reversal, we turn to the propriety of the judgment in favor of Seller based on its claim that Buyer failed to make payments due under the Non-Competition Agreement. In view of the reversal of the judgment on the counterclaim based on the Non-Competition Agreement, it necessarily follows that judgment in favor of Seller on its contract claim based on the Non-Competition Agreement must be reversed and vacated and await proper resolution of Buyer's counterclaim.

In sum, the district court's judgment entered in favor of Seller dismissing Buyer's counterclaim based on the jury's verdict is reversed and vacated, and the resolution of the counterclaim is remanded for further proceedings consistent with this opinion. In addition, judgment in favor of Seller based on Buyer's alleged breach of the Non-Competition Agreement is also reversed and vacated.

*The District Court Erred in Entering Judgment in Favor of Seller on the Promissory Note.*

Buyer claims that the district court erred in entering a money judgment in favor of Seller on both of Seller's breach of contract claims which alleged separately that Buyer failed to make payments on the Non-Competition Agreement and the Promissory

Note. We have explained above that the entry of judgment on Seller's claim that Buyer violated the payment obligations under the Non-Competition Agreement must be reversed and vacated. As explained below, resolution of whether Buyer improperly failed to make payments under the Promissory Note, or whether Buyer's payment obligation under this instrument will be excused or reduced, as by a damage award or setoff, must also await a proper resolution of Buyer's counterclaim, and therefore, entry of judgment in Seller's favor on its contract claim based on the Promissory Note must also be reversed and vacated at this time.

In answer to Seller's petition, Buyer alleged, inter alia, that Seller had competed against Buyer, in violation of Seller's agreement not to compete against Buyer, and that Seller had failed to sell its goodwill to Buyer, the purchase of which would be accomplished under an instrument to pay, denominated "Promissory Note." We note that the quantity and the quality of Seller's alleged violations of the agreements were substantial and not trivial and that a finder of fact could find the violations material. Buyer further alleged that by virtue of Seller's actions, Buyer was excused from making additional payments to Seller under both the Promissory Note and the Non-Competition Agreement. As discussed earlier in this opinion, Buyer counterclaimed, alleging Seller had violated the Non-Competition Agreement, and sought damages therefor. We have concluded that whether Seller violated the Non-Competition Agreement has not yet been properly submitted to the fact finder.

In the instant case, the transaction involving the sale of the Salvage Business was accomplished by three documents: the Agreement, the Promissory Note, and the Non-Competition Agreement. These three agreements were all executed at the same time and in the same place, and shared parties in common. Indeed, the Agreement refers to and incorporates the Promissory Note and the Non-Competition Agreement, the Promissory Note refers to the Agreement, and the Non-Competition Agreement refers to the Agreement and the Promissory Note. The three agreements were related and part of one transaction, and therefore their substance will be read together. See *Nowak v. Burke Energy Corp.*, 227 Neb. 463, 418 N.W.2d 236 (1988). See, also, *Lauritzen v. Davis*, 214 Neb. 547, 335 N.W.2d 520 (1983);

*Northland Mortgage Co. v. Royalwood Estates, Inc.*, 190 Neb. 46, 206 N.W.2d 328 (1973); *Cedars Corp. v. H. Krasne & Sons, Inc.*, 189 Neb. 220, 202 N.W.2d 205 (1972).

There is no dispute that the Agreement covered the sale of equipment and inventory and that the Non-Competition Agreement required Seller, with certain exceptions, not to compete with Buyer. Although we are aware of the long-term tax consequences of structuring the transaction as the parties did, we nevertheless determine that as the Agreement states and as the evidence shows, the Promissory Note in fact represented the payments Buyer was to make for acquisition of the goodwill sold by Seller.

We have stated generally that goodwill may be described as " ' "the habit of customers to return to the concern with which they have been previously dealing." ' " *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 759, 472 N.W.2d 391, 399 (1991) (quoting *Meeker v. Stuart*, 188 F. Supp. 272 (D.D.C. 1960)). More particularly, we have said that " 'good will is that "value which results from the probability that old customers will continue to trade or deal with the members of an established concern." ' " 238 Neb. at 759, 472 N.W.2d at 399 (quoting *Jackson v. Caldwell*, 18 Utah 2d 81, 415 P.2d 667 (1966)).

We have recognized that where the sale of goodwill is involved in the sale of a business, such as in the instant case, " 'the buyer's interest in what he has acquired cannot be effectively realized unless the seller engages not to act so as to unreasonably to diminish the value of what he has sold.' " 238 Neb. at 756, 472 N.W.2d at 397 (quoting Restatement (Second) of Contracts § 188, comment *b*. (1981)). We have explicitly recognized the interrelationship between goodwill and noncompetition in a single transaction, and we so recognize the interrelationship in the instant transaction between Seller's sale of goodwill under the Promissory Note and Seller's agreement not to compete under the Non-Competition Agreement. In this regard, we have stated that "a covenant not to compete which is contained in a contract for sale of a business is a seller's self-imposed restraint from trade and is frequently necessary to make goodwill in the seller's business a transferable asset and ensure that the buyer receives the full value of acquired goodwill." 238 Neb. at 756,

472 N.W.2d at 398. We apply the principles noted above to the instant transaction.

Given the nature of the entire transaction, we determine that Seller's promise not to compete and Seller's agreement to sell goodwill, reflected in the Non-Competition Agreement and the Promissory Note respectively, are inextricably intertwined. Given the intertwined nature of the Non-Competition Agreement and the Promissory Note, we further determine that whether payment under the Promissory Note will be enforced or excused, or reduced as by damage award or setoff, must await a proper resolution of whether Seller improperly competed with Buyer as alleged in Buyer's counterclaim. When agreements are inextricably intertwined, a breach of one agreement may excuse or reduce obligations on the other agreement. For the sake of completeness, we note that our recognition of the effect of the Non-Competition Agreement and the Agreement on the instrument to pay is consistent with Neb. U.C.C. § 3-117 (Reissue 2001) (pertaining to negotiable instruments and entitled "Other agreements affecting instrument"). Accord *Skiles v. Security State Bank*, 1 Neb. App. 360, 365, 494 N.W.2d 355, 359 (1992) (discussing earlier codification of § 3-117, denominated Neb. U.C.C. § 3-119 (Reissue 1980) and repealed in 1991, and noting that code provision "is consistent with longstanding Nebraska case law").

It is not uncommon for suit on a promissory note to be subjected to a defense. See, e.g., *Larsen v. First Bank*, 245 Neb. 950, 515 N.W.2d 804 (1994) (discussing duress as defense to promissory note); *S.I.D. No. 32 v. Continental Western Corp.*, 215 Neb. 843, 343 N.W.2d 314 (1983) (discussing fraud as defense to promissory note). See, also, Neb. U.C.C. § 3-305(a) (Reissue 2001) (discussing defenses to negotiable instruments). Indeed, in *Midlands Transp. Co. v. Apple Lines, Inc.*, 188 Neb. 435, 197 N.W.2d 646 (1972), although the obligor challenged enforcement of a promissory note in a "cross-petition" and the obligor's evidence was insufficient, we suggested that a promissory note was subject to a setoff where the entity entitled to enforce the note had allegedly violated a covenant not to compete. Our opinion in *Midlands Transp. Co.*, endorsing damages as a setoff against a promissory note, is consistent with well-recognized contract law that a minor breach of contract is compensable in

damages. See Restatement (Second) of Contracts §§ 236, 237, and 241 (1981). We note, however, that a material breach will excuse the nonbreaching party from its performance. *Id.* Thus, in *Electrical Distributors, Inc. v. SFR, Inc.*, 166 F.3d 1074, 1086 (10th Cir. 1999), it was stated in a case where the breach was material that "because [the breaching party] breached his covenant not to compete, [obligor] was excused from performance, *i.e.*, making payments on the note to [the breaching party]." See, also, *England v. O'Flynn*, No. 18952, 2002 WL 27314 (Ohio App. Jan. 11, 2002) (unpublished opinion) (affirming decision determining that defendant was not obligated to pay on promissory note when plaintiff had materially breached other related contract).

Elsewhere, the courts have recognized that where a promissory note is connected with certain other contractual obligations, the resolution of enforcement of the note must await resolution of the defenses thereto. Thus, for example, when the seller of a business in a summary proceeding sought to recover moneys owed on a promissory note, the appellate court concluded that denial of a seller's motion for summary judgment was proper because "the note being sued upon is inextricably intertwined with certain contractual obligations, including a noncompetition agreement, entered into between the parties." *Cohen v. Marvlee, Inc.*, 208 A.D.2d 792, 618 N.Y.S.2d 62, 63 (1994). The court in *Cohen* continued by stating: "While generally the breach of a related contract cannot defeat a motion for summary judgment on an instrument for money only, that rule does not apply where the contract and instrument are intertwined . . . ." *Id.* Similarly, in a termination of employment case involving a promissory note for severance pay and redemption of an employee's shares made in connection with a master termination agreement, the appellate court affirmed the denial of the former employee's motion for summary judgment on the note, stating that

> one of the defenses [to enforcement of the promissory note] is predicated upon the anti-competition provisions contained in the Master Agreement [and] given the fact the Master Agreement and the promissory note are intertwined, [the former employer] has shown the existence of a triable issue of fact with respect to a bona fide defense . . . .

*Lavelle v. Urbach, Kahn & Werlin P.C.*, 198 A.D.2d 751, 751-52, 604 N.Y.S.2d 614, 615 (1993). See, also, *Eurotech Development v. Adirondack Inc.*, 224 A.D.2d 738, 636 N.Y.S.2d 956 (1996); *Regal Limousine v. Allison Limousine Service*, 136 A.D.2d 534, 523 N.Y.S.2d 154 (1988).

In response to Seller's claim seeking to enforce the Promissory Note, Buyer, in part, alleged as a defense that Seller had breached the Non-Competition Agreement and that such breach excused Buyer's obligation to make further payments under both the Promissory Note and the Non-Competition Agreement. We have determined that there is an interrelationship between the Non-Competition Agreement and the Promissory Note, and as noted above, adherence to the agreement not to compete is often critical to the transfer of goodwill. It therefore follows that the jury's finding on Buyer's counterclaim alleging Seller violated the Non-Competition Agreement necessarily must precede any decision on Seller's breach of contract claim based on the Promissory Note, because in this case, a breach of the Non-Competition Agreement can excuse or reduce payment under the Promissory Note. Accordingly, we reverse the judgment in favor of Seller on the Promissory Note and remand the causes for further proceedings consistent with this opinion.

*Remaining Assignments of Error.*

Having concluded that the district court erred in instructing the jury with regard to Buyer's counterclaim and erred in entering judgment in Seller's favor on both of its breach of contract claims, we do not address Buyer's remaining assignments of error. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it. *Livingston v. Metropolitan Util. Dist.*, 269 Neb. 301, 692 N.W.2d 475 (2005).

## CONCLUSION

We conclude that the district court prejudicially erred in instructing the jury with regard to the Non-Competition Agreement and that the issues on the counterclaim must be resubmitted to the fact finder. Judgment against Buyer on its counterclaim and judgment in favor of Seller on the Non-Competition Agreement are both reversed and vacated. We further determine that the

Non-Competition Agreement and the Promissory Note are inextricably intertwined and that enforcement of the Promissory Note must be determined after the issues related to the Non-Competition Agreement are resolved. We therefore conclude that the district court erred in entering judgment at this time in favor of Seller and against Buyer on Seller's claim that Buyer breached the Promissory Note.

For the reasons stated above, we reverse and vacate the district court's judgment in its entirety and remand the causes for further proceedings consistent with this opinion.

REVERSED AND VACATED, AND CAUSES REMANDED
FOR FURTHER PROCEEDINGS.

GERRARD, J., dissenting.

I respectfully dissent. In my opinion, the record does not support the majority's characterization of the district court's determinations regarding the ambiguity of the Non-Competition Agreement. Rather, I believe the court determined that the Non-Competition Agreement was not ambiguous but that the plain language of the Non-Competition Agreement contemplated Seller's salvage of parts from 1961 and prior. I agree with the majority's conclusion that the plain language of the Non-Competition Agreement does not, standing alone, support this interpretation and is ambiguous in that regard.

However, this is an appeal from a judgment entered pursuant to jury verdict; thus, the question is whether the court erred in instructing the jury that the Non-Competition Agreement was intended to permit Seller to continue salvaging pre-1961 parts. While the Non-Competition Agreement was ambiguous, and the meaning of an ambiguous contract is generally a determination to be made by the trier of fact, the evidence presented at trial established as a matter of law that Seller's continued salvage of parts from 1961 and before was contemplated. Therefore, I conclude that the court did not err in instructing the jury to that effect.

### AMBIGUITY OF AGREEMENT

The majority premises its disposition of this appeal on its conclusion that "it is apparent that the district court, through its July 14, 2003, order and instruction No. 9, effectively concluded that the Non-Competition Agreement was ambiguous and supplied

terms to the Non-Competition Agreement which the parties had not included." The majority then concludes that the district court did not err in determining that the Non-Competition Agreement was ambiguous, but that the court erred in not submitting the meaning of the Non-Competition Agreement to the jury.

However, I see no support in the record for the assertion that the district court, even implicitly, found that the Non-Competition Agreement was ambiguous. At the pretrial hearing held on July 14, 2003, the court engaged in the following colloquy with Seller's counsel, memorializing for the record a discussion held in chambers prior to jury selection:

THE COURT: Let's see. I think I said something else, didn't I . . . ?

[Seller's counsel]: Yes, Your Honor.

THE COURT: Go ahead.

[Seller's counsel]: I think you reacted to your — the Court's responsibility to interpret the contract. You noted that there had been no allegations that the contract was ambiguous on behalf of either [side]. That being the case, I think, Nebraska law is quite clear in terms of if contracts are clear . . . the Court may not resort to the rules of construction simply to interpret the contract as a matter of law.

With regard to the issue of antiques, you look particularly at page 3 of the covenant not to compete,

THE COURT: I think it was 5A.

[Seller's counsel]: I think it's with regard to page 2 of the covenant not to compete that says specifically — and I wanted to quote that language for you, Judge. Here it is, page 2 of the noncompete clause, particularly paragraph no. 5 that "Notwithstanding any other provision to the contrary, this Non-Competition Agreement shall not restrict the following actions of seller and/or Phillips: a. The purchase and sale of antique (1961 and prior year) vehicle or machinery parts."

I think you determined that you are going to find as a matter of law that because of the language "notwithstanding any other provision to the contrary," that, in fact, that provision also contemplated that [Gary] Phillips and Gary's

Implement could salvage antique parts as long as they were 1961 or prior.

THE COURT: That is the finding of the Court.

At the conclusion of the hearing, the court accepted two exhibits into evidence: the Agreement and the Non-Competition Agreement. Significantly, other exhibits were received solely for the purposes of Buyer's offer of proof, but apparently were not considered by the court.

These events are reflected in the court's pretrial order, rendered on July 14, 2003. The court's order specifically noted that "there were no allegations that the contract was ambiguous." The court found that "the language" of the Non-Competition Agreement quoted above "contemplated that [Seller] could salvage parts as long as they were 1961 or prior." The court received the Agreement and Non-Competition Agreement into evidence for purposes of this order, but only "received the remaining exhibits for the purpose of the Offer of Proof."

My reading of the foregoing portions of the record is that contrary to the majority's assertion, the district court expressly did *not* conclude that the Non-Competition Agreement was ambiguous. The court noted the absence of any argument that the contract was ambiguous and determined the meaning of the contract "as a matter of law," basing its determination solely on the language of the Agreement and Non-Competition Agreement— the only evidence the court received for purposes of making that determination.

I recognize the quandary faced by the majority, because the district court's reasoning in making its determination is not crystal clear. The plain language of the Non-Competition Agreement, even when considered in conjunction with the Agreement, does not indicate as a matter of law that the parties contemplated Seller could continue to salvage parts from 1961 and before. However, I believe it is a fairer reading of the record to conclude that the court simply erred in its reading of the contract, rather than to assume that the court overlooked the basic proposition that the meaning of an ambiguous contract is a matter for the trier of fact. See, e.g., *Kropp v. Grand Island Pub. Sch. Dist. No. 2,* 246 Neb. 138, 517 N.W.2d 113 (1994).

No matter how the majority gets to the question, however, I agree with the majority's conclusion that the Non-Competition Agreement is ambiguous. While each of the parties contends that the contract is unambiguous and supports their respective positions, we are not bound by their arguments. See *Younker Brothers, Inc. v. Westroads, Inc.*, 196 Neb. 168, 241 N.W.2d 679 (1976). Whether a document is ambiguous is a question of law, and an appellate court considering such a question is obligated to reach a conclusion independent of the trial court's decision. *Union Ins. Co. v. Land and Sky, Inc.*, 247 Neb. 696, 529 N.W.2d 773 (1995). Therefore, this court's decision about the ambiguity of the contract does not depend on its characterization of the district court's determination.

Considering the Agreement and the Non-Competition Agreement together, see *Norwest Corp. v. State*, 253 Neb. 574, 571 N.W.2d 628 (1997), it is apparent that the parties intended for Buyer to purchase some aspects of Seller's business enterprises, but reserve other aspects for Seller. Buyer was to acquire Seller's salvage business, but the parties also contemplated that Seller's trade in antique tractor parts would be reserved. What is unclear, from these agreements, is whether Seller was to be precluded from the act of salvaging parts, to the extent that activity was being performed in support of Seller's purchase and sale of antique parts. This represents, at the very least, a latent ambiguity in the Non-Competition Agreement. See *Plambeck v. Union Pacific RR. Co.*, 244 Neb. 780, 509 N.W.2d 17 (1993). Stated another way, the agreements, considered together, are ambiguous on whether the salvage of antique tractor parts was part of the salvage business, acquired by Buyer, or the antique business, retained by Seller. I agree with the majority's ultimate conclusion that the Non-Competition Agreement is ambiguous.

### EVIDENCE OF MEANING OF NON-COMPETITION AGREEMENT

The majority states that "once the district court determined that the Non-Competition Agreement was ambiguous, the meaning of the ambiguous contract became a question for the fact finder." The meaning of an ambiguous contract is generally a question of fact. *Kropp, supra.*

However, while instructions withdrawing consideration of material issues of fact presented by the pleadings and evidence

are erroneous, the trial court must eliminate all matters not in dispute and submit only the controverted questions of fact on which the verdict must depend. *Palmtag v. Gartner Constr. Co.*, 245 Neb. 405, 513 N.W.2d 495 (1994). Under the former code pleading system, which was applicable in this case, jury instructions were to be confined to issues presented by the pleadings and supported by the evidence. See *Maxwell v. Montey*, 262 Neb. 160, 631 N.W.2d 455 (2001). A trial court did not need to instruct the jury on an issue where the facts did not justify such an instruction. *Farmers Mut. Ins. Co. v. Kment*, 265 Neb. 655, 658 N.W.2d 662 (2003).

Here, the majority assumes, without discussion, that because the meaning of an ambiguous contract is a question of fact, the meaning of the contract at issue in this case should have been decided by the trier of fact. However, if the evidence at trial would not support differing conclusions on the meaning of the ambiguous contract, then the district court did not err in taking that issue away from the jury. See, e.g., *Selig v. Wunderlich Contracting Co.*, 160 Neb. 215, 69 N.W.2d 861 (1955) (holding trial court erred in instructing jury on possible interpretation of agreement that was unsupported by evidence presented at trial). As explained by Justice Breyer, then on the U.S. Court of Appeals for the First Circuit:

> The words of a contract may be so clear themselves that reasonable people could not differ over their meaning. Then, the judge must decide the issue himself, just as he decides any factual issue in respect to which reasonable people cannot differ. . . . Courts, noting that the judge, not the jury, decides such a threshold matter, have sometimes referred to this initial question of language ambiguity as a question of "law," which we see as another way of saying that there is no "genuine" factual issue left for a jury to decide. . . . Even if there is ambiguity in the language, however, the evidence presented about the parties' intended meaning may be so one-sided that no reasonable person could decide the contrary. In such a circumstance, the judge also would take the matter from the jury, deciding the factual question of meaning himself as (in the same sense) one of "law."

(Citations omitted.) *Boston Five Cents Sav. Bank v. Dept. of Housing*, 768 F.2d 5, 8 (1st Cir. 1985). See, also, *Don J. McMurray Co. v. Wiesman*, 199 Neb. 494, 260 N.W.2d 196 (1977) (when terms of contract and facts and circumstances that aid in ascertaining intent of parties are insufficient to raise issue of fact, interpretation of contract is matter of law).

In the instant case, the record does not contain substantial evidence to suggest that the Non-Competition Agreement was intended to preclude Seller from engaging in the salvage of parts from 1961 and prior in support of its antique business. David Dyke testified at trial that he was upset, generally, by Seller's salvage operations because he thought "that was the goodwill I bought." Dyke explained:

> A significant portion of it was increased in the price I paid for the company because [Gary Phillips] convinced me that he knew everybody and everything that had anything to do with the farm machinery company in this entire region. [Gary Phillips] could introduce me to people to buy salvage, he could introduce me to the dealers that traded him salvage, he could keep in contact with all of the customers, big and small, he could identify what type of the machinery, where to locate it.

However, this testimony, and Buyer's other evidence, did not specifically address salvage in the context of Seller's antique business.

In contrast, Seller's evidence addressed that subject directly. Joan Phillips explained the operation of the antique business as a discrete operation from both the salvage business that was sold to the Buyer and the whole goods business that was also retained by Seller. The antique business, although operated separately from the salvage business, also involved "salvage" in the sense of taking a part off a piece of equipment to sell or use to restore another piece of equipment. The Phillipses each testified that the business purchased by Buyer was the used parts business and the salvage inventory that supported that business, but that the whole goods business and antique business continued to operate as before.

In short, the evidence adduced at trial established that the "salvage business" sold to Buyer was distinct from the "whole goods business" or "sales business," and the "antique business," both of

which were to be retained by Seller. The antique business, as it was operated before and after the Agreement, was supported by the salvaging of antique parts. However, the record is clear that the Non-Competition Agreement was not meant to prevent Seller from operating its whole goods and antique businesses and, thus, was not intended to preclude Seller from salvaging antique parts to support the antique business. Regardless of how it determined that the Non-Competition Agreement allowed Seller to salvage antique parts, the district court did not err, based on the evidence presented at trial, in instructing the jury to that effect.

### CONSIDERATION OF EXTRINSIC EVIDENCE

I recognize that given the posture of this case when it went to trial, Buyer was in a precarious position with respect to extrinsic evidence of the meaning of the Non-Competition Agreement. Neither party was arguing that the Non-Competition Agreement was ambiguous, and the district court had endorsed that conclusion.

Nonetheless, Buyer could have argued that even if the Non-Competition Agreement was ambiguous, extrinsic evidence existed to support an interpretation that was favorable to Buyer's position, and Buyer could have preserved that argument at trial by proffering such evidence. Instead, Buyer made the strategic choice, at trial and on appeal, to rely on the plain language of the contract, and the plain language of the contract simply does not support Buyer's position. Buyer chose not to make offers of proof containing evidence supporting its interpretation of the Non-Competition Agreement, and in my view, that choice has consequences on appeal.

In many ways, this case illustrates the limitations placed on litigants and courts by Nebraska's adherence, albeit implicit, to the "plain meaning" or "four corners" rule for determining the ambiguity of a contract. The rule in Nebraska has been that extrinsic evidence is not permitted to explain the terms of a contract that is not ambiguous. *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 655 N.W.2d 390 (2003). A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* Courts that subscribe to the " 'plain meaning

rule' " hold that the decision as to whether ambiguity exists must be made without reference to any source other than the contract itself. 5 Margaret N. Kniffin, Corbin on Contracts § 24.7 at 33 (Joseph M. Perillo rev. ed. 1998). See, e.g., *Sack Bros. v. Great Plains Co-op*, 260 Neb. 292, 616 N.W.2d 796 (2000).

However, as a noted commentator has explained, there is a growing trend toward admitting extrinsic evidence to explore whether ambiguity exists. See 5 Kniffin, Corbin on Contracts, *supra*, § 24.30 (citing cases). This court has not always been completely consistent in its adherence to the four corners doctrine, see, e.g., *Plambeck v. Union Pacific RR. Co.*, 244 Neb. 780, 509 N.W.2d 17 (1993), but we have not expressly recognized the sensible principle that in many instances, it is impossible to ascertain the intended meaning of contract terms without reference to the evidence of surrounding circumstances.

> Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. That possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage, but exists whenever the parties' understanding of the words used may have differed from the judge's understanding.

> Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties.

*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 39-40, 69 Cal. Rptr. 561, 565, 442 P.2d 641, 645 (1968). Simply stated, "[w]hen determining whether a contract is ambiguous, any relevant evidence must be considered. Otherwise, the determination of ambiguity is inherently one-sided, namely, it is based solely on the ' "extrinsic evidence of the judge's own linguistic education and experience." ' " (Citations omitted.) *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995). Accord, e.g., *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz.

148, 854 P.2d 1134 (1993) (en banc); *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 817 P.2d 238 (1991); *Harrigan v. Mason & Winograd, Inc.*, 121 R.I. 209, 397 A.2d 514 (1979); *Simpson v. State Mutual Life Assurance Co.*, 135 Vt. 554, 382 A.2d 198 (1977); *Anderson v. Kammeier*, 262 N.W.2d 366 (Minn. 1977). See, also, 5 Kniffin, Corbin on Contracts, *supra*, § 24.30; 2 E. Allan Farnsworth, Farnsworth on Contracts § 7.12a (2d ed. 1998). Consequently, in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance. *C.R. Anthony Co., supra.*

In accord with this view, the Restatement (Second) of Contracts § 212(1) at 125 (1981) states that "[t]he interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances . . . ." The Restatement, *supra*, comment *b.* at 126, further explains:

> It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. Accordingly, the rule stated in Subsection (1) is not limited to cases where it is determined that the language used is ambiguous. Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. . . . But after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention.

In my opinion, this process for determining whether a contract is ambiguous is more sensible and practical than rigidly adhering to an obsolete fixation on the "four corners" of the document. Just as significantly, I believe this process accurately reflects what courts are actually doing when determining the meaning of contracts, even if not permitted to acknowledge it.

In this case, for instance, the trial court and the parties would have been on much firmer ground had they known, from the outset, that the court could consider extrinsic evidence relevant to

the ambiguity of the contract. They would not have been forced to choose between arguing that the contract was unambiguous or presenting evidence relevant to the intent of the parties. And, had the relevant extrinsic evidence been considered prior to trial, the court could have openly relied on that evidence to support its conclusion that the Non-Competition Agreement did not prohibit Seller from continuing to salvage antique parts in support of its antique business—a conclusion which I believe, as explained above, is apparent when the relevant evidence is considered.

In short, the dubious procedural posture of this case demonstrates the impracticality of the "four corners" rule for determining whether a contract is ambiguous. But this case was tried under that rule, and it is pursuant to that rule that this appeal must be decided. However, this court should, in an appropriate case, consider expressly adopting the more sensible rule expressed in the Restatement, *supra*, advocated by respected commentators, and already embraced in several well-reasoned decisions from other jurisdictions.

## CONCLUSION

The evidence presented at trial in this case established, as a matter of law, that Seller was entitled, under the Non-Competition Agreement, to continue salvaging antique tractor parts. Thus, the court did not err in instructing the jury to that effect. I respectfully dissent.